## WILLCOX (FIRST NAT. BANK & TRUST CO. OF ROCHESTER, Intervener) v. GOESS.

District Court, S. D. New York.
June 24, 1936.

Morris Ehrlich, of New York City (Morris Ehrlich and Bernard H. Nearman, both of New York City, of counsel), for plaintiff.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy and Bernard Sobol, both of New York City, of counsel), for defendant Frederick V. Goess, receiver of Harriman Nat. Bank & Trust Company of City of New York.

George B. Rice, of Bayside, L. I., N. Y. (Percival D. Oviatt, of Rochester, N. Y., and George B. Rice, of Bayside, L. I., N. Y., of counsel), for First National Bank & Trust Co. of Rochester, New York, intervener.

WOOLSEY, District Judge.

My decision herein is as follows:

In the first suit there will be a decree for the plaintiff.

In the second suit there will be a decree dismissing the complaint.

In the third suit there will be a decree providing for a dismissal of the complaint as against the plaintiff and of the petition of intervention as against the intervener.

In the fourth, fifth, sixth, and seventh suits, there will be decrees dismissing each of the complaints.

Costs will not be granted to any party herein.

I. This is a consolidation of seven alleged causes of action brought by the plaintiff William R. Willcox, as trustee in bankruptcy of the estate of the J. A. M. A. Realty Corporation (hereinafter called "JAMA") against Frederick V. Goess, as receiver (hereinafter referred to as the Receiver) of the Harriman National Bank & Trust Company of the City of New York (hereinafter referred to as the Bank).

The subject-matter jurisdiction of this court in this consolidated cause is based on the fact that it is brought against a receiver of a closed national bank, who was appointed by the Comptroller of the Currency, and so arises under the laws of the United States. Title 28, United States Code, § 41 (1), 28 U.S.C.A. § 41 (1). Cf. Wyman v. Wallace, 201 U.S. 230, 241, 242, 26 S.Ct. 495, 50 L.Ed. 738; Auten v. United States National Bank, 174 U.S. 125, 141, 19 S.Ct. 628, 43 L.Ed. 920.

The several alleged causes of action which have been thus consolidated have to be separately dealt with hereinafter in some respects. It is necessary, however, first to summarize the facts which constitute the background of the situation out of which all these suits arose.

II. The corporate and other principal dramatis personæ herein, their respective descriptions with some comments on them, are as follows:

1. *The J. A. M. A. Realty Corporation*—of which the trustee in bankruptcy is plaintiff herein—was organized under the laws of the state of New York in 1923, and, during all the times involved herein, it had outstanding, issued for cash and property, 20,000 shares of capital stock, of which Joseph W. Harriman and his wife, Augusta B. Harriman, owned 19,992 shares. It was the holding corporation of the Harriman family property.

During all the times involved herein and until 1934, the officers of JAMA of importance to the discussion in this cause were as follows: Joseph W. Harriman, president, who had held that office from its organization in 1923; Augusta B. Harriman, vice president, who had held that office from its organization in 1923, and had been secretary from August 7, 1928; John A. Noble, vice president from January 4, 1926, to September 30, 1932; Matthew A. Foley, assistant secretary from September 15, 1931.

Joseph W. Harriman and Augusta B. Harriman were throughout also directors of JAMA.

The sources of JAMA'S income were: (1) Harriman bank stock; (2) interest on mortgages and loans; (3) interest from rent of real estate or equities therein; and (4) credits on accounts with brokers. Its income for the year 1931 was $152,646.81, and for the year 1932, $42,412.79.

On January 17, 1934, an involuntary petition in bankruptcy was filed in this court by Evan W. Hughes—formerly the confidential financial secretary of Joseph W. Harriman—against JAMA.

An order adjudicating JAMA a bankrupt was duly entered in this court on February 2, 1934, and thereafter William R. Willcox, the plaintiff herein, was elected trustee in bankruptcy of the said corporation and duly qualified as such.

The following persons and corporations have filed proofs of claim in the following principal amounts against JAMA in said bankruptcy proceeding:

| | |
|---|---|
| Frederick V. Goess, as receiver of the Harriman National Bank & Trust Company of the City of New York | $ 477,350.65 |
| Kings County Trust Company | 190,000.0J |
| Chase National Bank of the City of New York | 101,250.00 |
| Lawyers' County Trust Company | 67,144.86 |
| Union Trust Company of Maryland | 150,000.00 |
| The First National Bank & Trust Company of Rochester (on a judgment) | 50,000.00 |
| Marie T. Dixon | 75,000.00 |
| 2 East 70th Street Corporation (on a judgment) | 5,000.00 |
| 1170 Fifth Avenue Corporation | 470.00 |
| Evan W. Hughes | 32,929.00 |
| | $1,149,145.44 |

The only collateral held by any of these creditors, other than the Bank, is as follows:

Lawyers' County Trust Company, 596 shares of Bank stock.

Union Trust Company of Maryland, 600 shares of Bank stock.

First National Bank of Rochester, 200 shares of Bank stock.

Marie T. Dixon, chattel mortgage on certain furniture and works of art.

On December 31, 1935, the funds of the bankrupt estate in the hands of the plaintiff trustee amounted to $68,394.49.

2. *The Harriman National Bank & Trust Company of the City of New York*— of which the receiver Frederick V. Goess is defendant herein—at all times hereinafter mentioned was a banking corporation organized and existing under the National Bank Act of the United States (12 U.S.C.A. § 21 et seq.) having its principal place of business at 527 Fifth avenue, in the city of New York, where, from March, 1911, it had carried on a general banking business as successor to the Night & Day Bank which had opened at the same address on May 1, 1906.

The capital stock of the Bank was originally $200,000. At the time of its closing in March, 1933, and for several years prior thereto its capital stock consisted of 20,000 shares of the par value of $100.

The persons in control of the Bank during all the times hereinafter mentioned were the following:

Joseph W. Harriman, who was president from its beginning to July 14, 1932, and thereafter was made chairman of the board of directors without the power of the authority previously had and exercised by him as president.

Henry B. Cooper was elected president of the Bank on July 14, 1932, actively took over the functions of that office on July 21, 1932, and continued as president until the Bank was closed at the end of the so-called bank holiday in March, 1933.

On March 13, 1933, after the so-called bank holiday, on Mr. Cooper's recommendation the Bank was not reopened and he was appointed conservator thereof and duly qualified as such.

On October 16, 1933, the defendant, Frederick V. Goess, was appointed by the Comptroller of the Currency to be receiver of the Bank and duly qualified as such.

3. *The Harriman Securities Corporation*—hereinafter referred to as the Securities Corporation—was organized on or about April 27, 1925, under the laws of the state of New York at the instance of the then directors of the Bank for the purpose of purchasing and dealing in securities and in doing business and carrying on transactions, including the purchase of securities, which the Bank was prohibited from doing by the national banking

laws, and it continued as such during the times hereinafter mentioned.

The stock of the Securities Corporation was held by trustees, and, pursuant to an agreement dated April 16, 1925, the owner of each share of stock of the Bank became entitled to a beneficial interest—transferable only with the shares of the Bank stock—in a share of stock of the Securities Corporation.

During the years before 1929 to 1932, Joseph W. Harriman was president of the Securities Corporation.

On or about July 15, 1933, the Securities Corporation filed a voluntary petition in bankruptcy in this court and the Irving Trust Company was thereafter duly appointed its trustee in bankruptcy and duly qualified as such.

4. *The M. H. O. Company, Inc.*, was a corporation organized under the laws of the state of New York and all the stock thereof was owned beneficially by Joseph W. Harriman and Augusta B. Harriman. The said company was used by Harriman to engage in trading in securities on margin. All the funds of the said company were obtained either by borrowing from JAMA or from the Bank.

5. *The Midtown Trading Corporation* was a corp-ration organized under the laws of the state of New York. All its stock was owned beneficially by Harriman. Its funds were also secured by borrowing from JAMA or from the Bank.

6. *Augusta B. Harriman* was the wife of Harriman. Her principal role herein is as vice president of JAMA. She filed a voluntary petition in bankruptcy on March 21, 1933, in this court, and was adjudicated a bankrupt thereon on March 21, 1933. The Irving Trust Company was appointed her trustee in bankruptcy and duly qualified as such. All the claims against her estate in bankruptcy, except the claim of Henry E. Cooper, as conservator of the Harriman National Bank & Trust Company of the City of New York, were expunged, and on June 19, 1934, the Irving Trust Company, as trustee in bankruptcy of Augusta B. Harriman, indorsed and delivered to Frederick V. Goess, as receiver of the Bank, a demand promissory note of JAMA to her, dated May 7, 1932, in the principal amount of $30,000.

7. *The First National Bank & Trust Company of Rochester*—hereinafter called the Rochester Bank—intervened in action No. 3. This is a banking corporation duly organized and existing under the national banking act with its principal place of business in the city of Rochester, N. Y.

8. *Joseph W. Harriman*—hereinafter called Harriman—was admittedly the dominating figure in the Bank and the Securities Corporation, in both of which his word was law. He was given, as of course, by corporate resolution, absolute control of JAMA'S affairs, for his wife had not any business experience. Harriman, as will be noted later, had a broad power of attorney from JAMA which was lodged with the Bank. He used the M. H. O. Company, Inc., and the Midtown Trading Corporation, which he owned in their entirety, as corporate shields behind which he hid when it was convenient to do so for the sake of getting loans from the Bank in excess of the legally permissible limit for loans to a single borrower.

(a) The largest proportion of Harriman's once considerable fortune was invested in stock of the Bank, registered in the name of JAMA and others. As the depression of business, which began in the latter part of 1929, grew worse, Harriman attempted to maintain, in respect of his personal credit, a situation of which the whole structural strength depended on the maintenance of a false market value for the Bank stock at a figure of from $1,200 to $1,400 per share, which was admittedly wholly disproportionate to its book value—as hereinafter found—and more than four times as high as the price which expectably it would have commanded in a free market.

The principal purpose of maintaining this false market seems to have been to prevent the creditors of JAMA or of Harriman who held stock of the Bank as collateral to their loans from foreclosing thereon or demanding additional security.

The details of the methods followed in maintaining this false market for the Bank stock are not relevant in this cause, but it is common ground, as I understand it, that in the maintenance thereof moneys of the Bank to the amount of upwards of $7,900,-000 were used, and that therewith 5,546½ shares of the Bank stock were acquired by the several persons and corporations who were participants in the false market transactions.

This explains the financial collapse of the Bank, of Harriman, and of JAMA.

(b) It should be noted that the Bank was the only one of the creditors of Harriman or of his personal corporations which could not properly take Bank stock as collateral. The result was that when pressure was put on Harriman in September, 1931, by the national bank examiner, and slightly later by the examiner for the Clearing House, who were criticizing some of the Bank loans to JAMA and to Harriman, Harriman was forced to turn over to the Bank most of JAMA'S assets of value except its Bank stock.

Thus the Bank came to have its loans secured by what events have proved to be JAMA'S best assets, and when JAMA'S own creditors—unsecured, or secured, with one exception, by Bank stock—came around after the bankruptcy, they found little of value to be shared amongst them.

(c) Harriman must at least be held to have known that the best assets of JAMA were being given to secure the loans of the Bank or of the Securities Corporation to JAMA and that, in the event of the fall of the house of cards which he was trying to keep together, the Bank would have preference over JAMA'S creditors. But he had to make the transfers because the bank examiners were becoming increasingly suspicious, and to save himself he had, at all hazards, to maintain a facade for the Bank which looked impregnable.

Consequently, whether the transfers made for the Bank's benefit when Harriman was president of the Bank are voidable preferences or not has to turn solely on JAMA'S financial condition on the dates when they were made as tested by the criterion of solvency applicable under the statute involved in the trustee's attempt to set them aside.

III. The question of whether the transfers of JAMA'S assets to the Bank are voidable or not arises under the first three suits; that is, Equity No. 78—44, Equity No. 78—56, and Equity No. 78—115.

A. A summary of the facts underlying these causes of action follows:

1. On June 8, 1931, JAMA borrowed $150,000 from the Bank and gave therefor a simple unsecured note payable September 8, 1931.

The sum thus borrowed was used to pay an indebtedness of $150,000 due from JAMA to the Securities Corporation.

This note for $150,000 was renewed as a simple note on September 8, 1931, December 7, 1931, March 7, 1932, and July 6, 1932.

2. On October 13, 1931, JAMA borrowed from the Bank $195,000 more. This was credited on its account with the Bank, and for which it gave a simple note payable January 11, 1932. This sum was also used by JAMA to pay off an indebtedness of $195,000 owed by it to the Securities Corporation.

This note of October 13, 1931, for $195,000 was renewed in simple form on January 11, 1932, on April 11, 1932, and on July 11, 1932.

3. On or about October 13, 1931, as a result of pressure from the bank examiners, Harriman had JAMA execute and deliver to the Bank as collateral for its indebtedness to the Bank amounting to $345,000, the following:

(a) An assignment of what was referred to throughout the trial and will be herein called the Brookville mortgage. This was a purchase-money mortgage given by one A. L. Smith (of the Philadelphia banking house of E. B. Smith & Co.) to Harriman, when Harriman sold him the Harriman country estate at Brookville, Long Island, in 1929. This assignment was executed by Augusta B. Harriman as vice president of JAMA, and by M. A. Foley as its assistant secretary.

(b) An assignment of a proprietary lease and 173 shares of the capital stock of a co-operative apartment at 1170 Fifth avenue, which was also executed by Augusta B. Harriman as vice president of JAMA, and by M. A. Foley as its assistant secretary.

4. On October 13, 1931, after JAMA with the proceeds of the note for $195,000 above mentioned had paid its indebtedness to the Securities Corporation in that sum, Harriman caused it to borrow on a simple note from the Securities Corporation $400,000, and to deliver to the Securities Corporation as collateral security for said loan—

(a) A deed to property owned by JAMA situate at 20 East Fifty-Fourth street, executed by Augusta B. Harriman as vice president of JAMA, and by M. A. Foley as assistant secretary.

(b) An assignment of the proprietary lease and stock in a cooperative apartment owned by JAMA at 2 East Seventieth street, also executed by Augusta B. Harriman as vice president of JAMA, and by M. A. Foley as assistant secretary.

5. At the first renewal of JAMA'S note of $195,000 to the Bank on January 11, 1932, JAMA was no longer indebted to the Securities Corporation, and Harriman caused the Securities Corporation to execute an assignment of the proprietary lease and stock of the co-operative apartment at 2 East Seventieth street to the Bank and then caused it to be put as security under his personal loan.

What happened at this time to the deed to 20 East Fifty-Fourth street is not clearly shown, but it is fairly inferable from the subsequent developments that it was returned to JAMA.

6. On March 19, 1932, Harriman caused the Bank to lend $50,000 to the Securities Corporation, and on March 22, 1932, Harriman caused the Securities Corporation to lend the said money to JAMA.

On or prior to March 24, 1932, JAMA redelivered to the Securities Corporation as collateral security for said loan the above-mentioned deed, dated October 13, 1931, whereby JAMA conveyed to the Securities Corporation the property situate at 20 East Fifty-Fourth street.

The said funds were used by JAMA on the same day for payments to its brokers, Harriman & Co., and were credited to an account with them called "J. A. M. A. Realty Corporation."

On April 4, 1932, Harriman caused the Securities Corporation to lend to JAMA $50,000 more, and JAMA on the same day used the said funds to pay in part its then existing indebtedness to the Chase National Bank.

7. From April 4, 1932 until May 17, 1932, the Securities Corporation held the deed to 20 East Fifty-Fourth street above mentioned as collateral security for this debt of $100,000 which thus had become due to it from JAMA.

8. On April 25, 1932, the Clearing House examiner made an examination of the Bank and criticized many of the loans of the Bank including, among others, its loans to Harriman and to JAMA.

9. After the said examination, and on May 17, 1932, Harriman caused the Securities Corporation, which then held the deed to 20 East Fifty-Fourth street as collateral security for JAMA's aforesaid indebtedness to it, to convey by deed the said premises to the Bank, and also to turn over to the Bank its deed from JAMA thereto. Harriman then caused the Bank to put the said deeds as collateral security under a note of his own to the Bank.

10. There was no direct conveyance of 20 East Fifty-Fourth street by JAMA to the Bank on May 17, 1932.

11. Prior to the conveyance on May 17, 1932, of 20 East Fifty-Fourth street by the Securities Corporation to the Bank, the said premises were encumbered by the lien of a first mortgage held by the United States Trust Company in the principal sum of $50,000. Consequently, at the time when said premises were held by the Securities Corporation as collateral security for JAMA'S indebtedness to it in the principal sum of $100,000, the only interest therein available to creditors of JAMA, other than the first mortgagee and the Securities Corporation, was the equity therein over and above those liens. This equity amounted to nothing for the property was then worth only $125,000.

12. As will be later noticed in greater detail, neither this deed nor any of the assignments above mentioned were recorded until October, 1932.

13. On December 8, 1931, JAMA was, as has been shown, in debt to the Bank in the total sum of $345,000. Harriman wished to borrow more money for JAMA in order that it might be able to loan the money to the Securities Corporation to help the latter corporation pay its semi-annual dividend in January, 1932.

Accordingly, Harriman had recourse to the following subterfuge to avoid JAMA'S having such loans from the Bank in excess of its quota as would violate the national banking act:

A man named Harry J. Levin was induced by Harriman to borrow $100,000 from the Bank, for which he signed a collateral promissory note secured by collateral valued at approximately $120,000, and, at the same time, a side agreement was made between Harriman and Levin to the effect that the proceeds of this note were to be used to purchase shares of Bank stock, and that Harriman was to repurchase this stock from Levin at the end of six months for the sum of $100,000, and that as payment for thus loaning his credit to Harriman for six months, Levin was to receive 5 shares of Bank stock at the end of the said period.

In return for Levin's collateral promissory note, the Bank delivered to Levin a cashier's check which was indorsed by

Levin and cashed by the paying teller of the Bank.

The proceeds of this cashier's check were then deposited in cash in JAMA'S account, in part on December 8, and in part on December 9, 1931.

Thereupon JAMA used the funds thus secured to pay part of its then indebtedness to the Securities Corporation in the sum of $100,000.

14. On January 7, 1932, the regular semiannual dividend of the Securities Corporation, which was maintained at $7.50 per share, was due to be paid. For this purpose the Securities Corporation needed $150,000.

The $100,000 paid to the Securities Corporation by JAMA, as above described, seems to have been used to meet in part the requirements of this dividend.

JAMA, as the then owner of 3,451 shares of the affiliated shares of the Bank and the Securities Corporation, received its dividends on those shares at the rate of $17.50 per share—$10 from the Bank and $7.50 from the Securities Corporation—amounting in all to the sum of $60,392.50.

15. When Levin's note matured on June 8, 1932, the funds of JAMA were used to pay to the Bank the interest thereon.

But when called on to pay the principal, Levin denied any liability on the note and the matter was brought to the attention of Mr. Henry E. Cooper, who, as above noted, had on or about July 21, 1932—at the insistence of the New York Clearing House—become President of the Bank.

On investigation, Mr. Cooper ascertained that this $100,000 loan of December 8, 1931, from the Bank via Levin to JAMA, had been used for its proper corporate purpose by JAMA in payment of part of its indebtedness to the Securities Corporation, and that, consequently, in spite of the fantastic arrangement with Levin, JAMA had been the real beneficiary of the loan.

Thereupon Mr. Cooper, in July, 1932, after a conference with Levin and his attorney, released Levin's collateral and surrendered Levin's note to him.

Then on Mr. Cooper's insistence, JAMA, on July 25, 1932, acting through Harriman as its president, executed and delivered to the Bank its note in collateral form in the sum of $100,000.

The items of collateral mentioned in this note were:

(a) A deed to the premises called High Farms at Glen Cove, Long Island;

(b) The assignment of a mortgage on land in West Orange, N. J.;

(c) A chattel mortgage on certain personal property of JAMA consisting of works of art, furniture, tapestries, etc.; and

(d) Two hundred shares of Bank stock which were delivered by Harriman to JAMA to be used for this purpose.

This collateral note was indorsed by Harriman and renewed in the same form with his indorsement on January 25, 1933.

16. On September 8, 1932, the chattel mortgage on the personal property owned by JAMA, which had been executed on September 2, 1932, and which was part of the agreed collateral for the note for $100,000 given to cover JAMA'S indebtedness in respect of the Levin transaction, was filed in the office of the registrar of the county of New York.

17. On October 4, 1932, JAMA'S renewed note for its loan from the Bank of June 8, 1931, in the sum of $150,000, and its renewed note for its loan from the Bank of October 13, 1931, in the sum of $195,000, together with some accrued interest, were consolidated into a single collateral note for $347,409.70.

This note was indorsed by Harriman, and the items of collateral listed therein were as follows:

(a) The Brookville mortgage.

(b) The lease and stock of a cooperative apartment at 1170 Fifth avenue.

This collateral had been held by the Bank under JAMA'S loans since the middle of October, 1931.

18. On October 5, 1932, owing to JAMA'S failure to deposit additional collateral when demanded, the Rochester Bank, in pursuance of the provisions of a collateral three months' note, dated August 2, 1932, which JAMA had given to it for a loan of $50,000, accelerated the maturity date of the note and so advised JAMA.

This action by the Rochester Bank seems to have precipitated the recording, in the first half of October, 1932, by the Bank, of the deeds above mentioned, as well as other transfers from JAMA which had remained unrecorded in the Bank's

possession from the middle of October, 1931.

19. On October 5, 1932, the deed, executed on October 13, 1931, by JAMA, to the Securities Corporation, of 20 East Fifty-Fourth street, and the deed, executed on May 17, 1932, by the Securities Corporation, to the Bank, together with the assignment of the proprietary lease at 2 East Seventieth street, were recorded.

20. On October 10, 1932, the assignment of the Brookville mortgage by JAMA to the Bank, executed October 13, 1931, the High Farms deed by JAMA to the Bank, executed July 25, 1932, and the assignment of the West Orange mortgage by JAMA, to the Bank also executed on the latter date, were recorded.

21. On October 10, 1932, action against JAMA on its note was threatened by the Rochester Bank, was begun on October 17, 1932, judgment was entered against JAMA therein in Monroe county on November 16, 1932, and a transcript of the judgment roll was duly filed in New York county on November 23, 1932. Execution issued on this judgment in New York county and was returned unsatisfied February 2, 1933.

22. This, in brief, is a history of the transactions by which the Bank became transferee of the assets of JAMA above enumerated, and the steps taken by it to consolidate its position in respect thereof.

As above indicated, the objective of the first three causes of action is to set aside these transfers on the ground that they were preferences or conveyances in fraud of creditors.

23. The Rochester Bank, the intervener in the so-called suit No. 3, Equity 78—115, claims that by reason of the filing in New York county of the transcript of its judgment against JAMA, as above mentioned, it secured a lien for the amount of $50,394.90 with interest at 6 per cent. from the date of its judgment, November 16, 1932, on the property at 20 East Fifty-Fourth street. By stipulation, if there be such a lien, it has been transferred, subject to my decision herein, to the proceeds of sale of said property now in the Receiver's hands.

24. The so-called first suit, Equity 78—44, deals with transfers made on July 25, 1932; the so-called second suit, Equity 78—56, deals with transfers made on October 13, 1931, and the so-called third suit, Equity 78—115, deals with a transfer made on May 17, 1932. They will each be hereinafter dealt with in such detail as may be necessary.

B. However, before I take up the suits, just referred to, separately, there are certain questions raised by the plaintiff which are involved in several of the transfers of JAMA'S property and will, therefore, be first decided in order to determine whether what was done by the transferor duly divested it of its property and thus accomplished a transfer thereof to the transferee.

1. Where a corporation is the transferor, it must first be decided whether the required form of corporate consent was present to allow the particular kind of transfer in question.

(a) Section 16 of the New York Stock Corporation Law (Consol.Laws, c. 59) deals with consent to corporate mortgages and provides, so far as here relevant, as follows: "The consent to the execution of such mortgage, except a purchase-money mortgage, by the holders of not less than two-thirds of the total number of shares outstanding entitled to vote thereon, given either in writing or by vote at a meeting of the stockholders called for that purpose in the manner prescribed by section forty-five, shall be required. A certificate that such consent was given by the stockholders in writing or that it was given by vote at a meeting as aforesaid, shall be subscribed, acknowledged and verified by the president or a vice-president and by the secretary or an assistant secretary of the corporation, and shall be filed and recorded in the office of the clerk or register of each county in which the mortgage is filed or recorded."

But it is settled law in this court, failing a definitive construction of this section by the New York Court of Appeals, that actual consent of stockholders owning two-thirds of the stock entitled to vote on the question may be shown without following the precise formalities prescribed by the section just quoted. In re Victoria Fusilli Co., 79 F.(2d) 611, 612 (C.C.A.2); Cf. In re Quigley Motor Sales, 75 F.(2d) 253, 254 (C.C.A.2); In re Paul De Laney Co., 26 F.(2d) 961, 963 (C.C.A.2); In re Oliver C. Putney Granite Corporation (D.C.) 14 F.Supp. 31, 32, 33.

■ In the present case the mortgages or deeds intended as mortgages executed by JAMA on October 13, 1931, were signed by Augusta B. Harriman, its vice president and secretary, who owned 11,532 shares of the JAMA stock, and were delivered to the transferees by Harriman, who owned 8,640 shares thereof. The joint stockholding in JAMA of Harriman and his wife, therefore, was far more than two-thirds of the outstanding 20,000 shares.

As to the deed and the chattel mortgage given as collateral under the note of July 25, 1932, they were signed by Harriman in pursuance of the authority vested in him by unanimous resolution (hereinafter mentioned and dated January 26, 1923) of the board of directors of JAMA of which both he and his wife were members.

To hold mortgages and deeds,—intended as mortgages and executed and delivered under such circumstances—void for lack of consent by two-thirds of the stockholders, would, in my opinion, be an obvious trespass on the actualities of the situation, and, as I appear at present not to be forced to do so by controlling authorities, I refuse so to hold.

(b) When the pledging of JAMA'S assets is considered, the question is one of the authority vested in Harriman, as president of JAMA, either implicitly by reason of his position and his many transactions with the Bank in that capacity, or explicitly under a resolution of its board of directors.

Harriman's authority to pledge JAMA'S property as collateral is shown not only by the estoppels arising out of the ordinary course of business between the Bank and JAMA over many years, but also by the unanimous resolution of JAMA'S board of directors adopted on January 26, 1923, shortly after its incorporation, and filed with the Bank on January 7, 1930.

This resolution authorized Harriman from time to time to borrow money and obtain credit from the Bank on behalf of JAMA and on its credit and on such terms as might seem to him advisable, and deliver the notes or other obligations of JAMA signed by him as president in such form as the Bank might require, and further authorized him to pledge any bonds, stocks, bills, and accounts receivable, or other property of the corporation as collateral security for such notes and obligations.

I think it is quite clear, therefore, that so far as the giving of mortgages on the property of the corporation or deeds intended as mortgages thereon and the pledging of the property of the corporation as collateral is concerned, there is not any question that the necessary corporate authority existed.

■ 2. The next general question to be considered is whether the transfers thus authorized by JAMA were fully achieved by a surrender of JAMA'S dominion over the subject-matter of the transfers.

It is common ground that the assignments of the mortgages and leases and the deed to 20 East Fifty-Fourth street, made by JAMA on October 13, 1931, were not recorded until the early part of October, 1932.

The fact that Harriman, as above stated, was the dominating figure in the Bank and the Securities Corporation and had absolute control of JAMA as his private holding company, puts the situation into a zone wherein it is natural for the plaintiff to claim that the failure to record these instruments was a badge of fraud, and wherein perhaps a court would tend to be hospitable to such a claim.

But it must always be remembered, throughout the consideration of the facts in this cause, that JAMA, the Bank, and the Securities Corporation, were separate legal entities, each with its own separate obligations to creditors, and, in spite of the "sole actor" doctrine which was favorably noticed by Judge Knox in Munroe v. Harriman et al. (D.C.) 16 F.Supp. 341, decided July 11, 1935, and in the case of Satterwhite v. Harriman National Bank & Trust Co. et al. (D.C.) 13 F.Supp. 489, it would be an error to allow Harriman's knowledge in regard to and control of these different corporations to blur corporate distinctions, after creditors, as here, have become entitled to throw their clutch into the situation and achieve through their appropriate representatives a locus standi therein.

It is now necessary to endeavor, therefore, as far as possible, to deal with each of the recurrent complicated situations involved herein as if the several corporations concerned were dealing with each other at arm's length and were not acting as Harriman's puppets.

As I understand it, the claim, that the failure to record the assignments or the

deed mentioned rendered them invalid as transfers, involves merely the application to different subject-matters of the principle which was dealt with by the Supreme Court in Benedict v. Ratner, 268 U. S. 353, 45 S.Ct. 566, 69 L.Ed. 991, namely, that due to an agreement, a secret trust or otherwise, the dominion over the property supposed to be conveyed by the instrument in question actually has not been transferred to the grantee.

Here, the instruments on their face purported to divest JAMA of title and vest the Bank or the Securities Corporation, as the case might be, with title to and control of the property in question. No secret trust is shown, and the fact that Harriman, as the controller of the situation, might have changed it by reassignment or by surrender of the assignments or by having JAMA recapture the deed, without paying the debt which it secured, is wholly unimportant until he actually did something of the kind; but he never acted in this regard.

It is quite possible, as I suggested on the trial, that the recording of these instruments was postponed in order that Harriman might keep the situation inside the Bank as plastic as possible for JAMA'S loans so as to fit in with his extraordinary financial methods of shifting collateral from one loan to another. But, inasmuch as all this collateral given to the Bank was required by the national bank examiners or by the examiner for the Clearing House, and as those examiners were regularly turning up from time to time to see how the matter lay, the strongest of sanctions was operating on Harriman, namely, his dread of what might happen to the Bank and to him if he played false with the bank examiners and was caught at it. I think it is clear, therefore, that under the circumstances herein, the fact that the transfers were not promptly recorded cannot be considered to indicate that they were not actual transfers giving dominion over their subject-matter to the Bank.

■ 3. The next question is whether the chattel mortgage which JAMA promised to give to the Bank on July 25, 1932, and which was named as part of the collateral for its note of that date in the sum of $100,000, was filed within a reasonable time after its execution, and whether its validity was maintained by the filing of proper notices by the Bank as mortgagee and by its successors in interest.

The mortgage was executed on September 2, 1932, and filed on September 8, 1932. That certainly was not an unreasonable time after its execution, and it was not, of course, until the mortgage was actually filed that the Bank acquired a lien on the chattels in question. Furthermore, if the question of the delay between July 25, 1932, when JAMA promised to give the chattel mortgage, and September 8, 1932, when it was actually filed, is regarded as important, it may be observed that there was not any new obligation incurred by JAMA during the period intervening between the promise to give the mortgage and its filing.

■ Leaving aside for the moment any consideration of the voidability of this mortgage as a preference, the next question which arises is whether, under section 235 of the Lien Law of New York State (Consol.Laws, c. 33), having received and filed a chattel mortgage, the Bank maintained its validity by filing at the times required a proper statement of the Bank's interest in the property claimed by virtue thereof.

Section 235 of the Lien Law of the State of New York, so far as here pertinent, provides as follows:

"A chattel mortgage, except as otherwise provided in this article, shall be invalid as against creditors of the mortgagor and against subsequent purchasers or mortgagees in good faith, after the expiration of the first or any succeeding term of one year, reckoning from the time of the first filing, unless,

"1. Within thirty days next preceding the expiration of each such term, a statement containing a description of such mortgage, the names of the parties, the time when and place where filed, the interest of the mortgagee or any person who has succeeded to his interest in the property claimed by virtue thereof."

When Mr. Cooper, as conservator of the Bank, on August 31, 1933, filed his statement setting forth the interest of the Bank in the property claimed by it as mortgagee under the chattel mortgage, his statement, in so far as here relevant, was as follows:

"The present interest and claim of said Bank and of said Conservator in said chattel mortgage is that the same is held by

the said Bank and-or by the Conservator for the benefit of the Bank, and there is now due and unpaid thereon the sum of $100,000, with interest at the rate of 5% per annum from January 26, 1933, and that said chattel mortgage is also held by them as collateral security for the payment of all liability and indebtedness of said J. A. M. A. to said Bank aggregating the principal amount of $447,350.65, with interest at the rate of 5% per annum on the following sums:

"(a)   $347,409.70 from January 4, 1933, to July 13, 1933.

"(b)   $347,350.65 from July 14, 1933.

"(c)   $100,000 from January 26, 1933."

When on August 20, 1934, Mr. Goess, as Receiver of the Bank, filed his statement of the Bank's interest in the property claimed by it as mortgagee under this mortgage, he used exactly the same form substituting the word "Receiver" for the word "Conservator."

The rationale of requiring these refiling statements is explained in the opinion of the Court of Appeals of the State of New York in Porter v. Parmley, 52 N.Y. 185, at page 188, which held that, even where there is a forfeiture, the chattel mortgage must be refiled in accordance with the Lien Law, and in which the court said: "The same reason then remains for refiling that existed before the forfeiture. The mortgagor is, to the public, the apparent owner. The statute requires a statement to be filed, to show the true interest of the parties, for the protection of the public. Whatever its purpose, it is enough that the statute so declares."

The defendant claims that these refiling statements were made precisely in accordance with the requirements of the statute. I agree.

Mr. Cooper and Mr. Goess each first stated exactly the amount due on the mortgage at the time of refiling, and then, in order not to waive their rights under the general lien given to the Bank by the collateral note of July 25, 1932, which was part of the transaction out of which the mortgage arose, stated that the property claimed under the mortgage was also held as collateral security for all the indebtedness of JAMA to the Bank. Clearly, there was not any false statement with regard to the amount due on the mortgage, or of the interest of the mortgagee in the property claimed thereunder.

C. All the transfers by JAMA involved in this cause were given either to secure present advances by or enforceable antecedent debts to the Bank. Hence they were given for fair consideration and, as no intent to defraud other creditors is shown, they would not come within the category of conveyances in fraud of creditors, Strongin v. International Acceptance Bank, 70 F.(2d) 248, 252 (C.C.A. 2); Irving Trust Company v. Chase National Bank, 65 F.(2d) 409, 411 (C.C.A.2); even if JAMA were insolvent when it made some of the transfers, In re Handerson (D.C.) 3 F.Supp. 92, 93.

The petition in bankruptcy against JAMA under which the plaintiff became trustee was filed on January 17, 1934. The latest transfer of property by JAMA to the Bank of which complaint is made in this consolidated cause occurred on July 25, 1932, and, consequently, the four months' statute of limitation in bankruptcy (Bankr. Act § 60a, as amended, 11 U.S.C.A. § 96 (a) had run and the plaintiff trustee is forced to rely for any recovery of preferences on section 15 of the New York State Stock Corporation Law (Consol. Laws, c. 59) in its present form.

So far as relevant, this section as amended by the Laws of 1929, chapter 653, effective on April 15, 1929, reads as follows (italics mine):

"§ 15.  *Prohibited transfers to officers, stockholders, directors or creditors.*  No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash.  No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder *when the corporation is insolvent or its insolvency is imminent,* with the intent of giving a preference to any particular creditor over other creditors or the corporation, shall be valid, except *as to any rights or interest which may be acquired thereunder by any person without notice or reasonable cause to believe that such conveyance, assignment, transfer, pay-*

ment, judgment, lien or security would effect a preference. * * * Every person receiving by means of any such prohibited act or deed any property of a corporation shall be bound to account therefor to its creditors or stockholders or other trustees. * * * Every transfer or assignment or other act done in violation of the foregoing provisions of this section shall be void, *except as hereinbefore provided.* * * * No such conveyance, assignment or transfer shall be void in the hands of a purchaser for a valuable consideration without notice."

■ Counsel for the trustee in bankruptcy claims that the definition of "insolvency" under section 271* of the Debtor and Creditor Law (Consol.Laws, c. 12) should be the criterion of insolvency under section 15 of the Stock Corporation Law because it is a legislative definition of insolvency.

I do not think that this construction is tenable because the two statutes are not in pari materia, as one deals with fraudulent conveyances and the other with preferences. Cf. Van Inderstine v. National Discount Company, 227 U.S. 575, 582, 33 S.Ct. 343, 57 L.Ed. 652. Consequently, I hold that the statutory definition of "insolvency" under the Debtor and Creditor Law does not bridge over into section 15 of the Corporation Law.

■ As I understand the decisions in the federal courts, the true criterion of the insolvency of a corporation under section 15 of the Stock Corporation Law is whether at the time of an allegedly preferential transfer the corporation in question is obviously in such condition as not to be able to meet its obligations as they mature or that such a condition is expectably imminent. Childs v. County Trust Company (D.C.) 6 F.Supp. 821, 823, affirmed without opinion 70 F.(2d) 1012 (C.C.A.2); Emerson v. Berman, 57 F.(2d) 637 (C.C.A.2); Irving Trust Company v. Chase National Bank, 72 F.(2d) 668 (C.C.A.2); In re Utrecht Coal Company, 63 F.(2d) 745 (C.C.A.2).

This, as I understand it, has been the law of New York since the case of Brouwer v. Harbeck, 9 N.Y. 589, which dealt with a statute in pari materia with section 15 of the Stock Corporation Law, although limited to moneyed corporations. The Court of Appeals in that case said at page 594 of 9 N.Y.: "A corporation, like an individual, is insolvent when it is not able to pay its debts. Insolvency means a general inability to answer in the course of business the liabilities existing and capable of being enforced."

I think the crucial words in this definition of insolvency are "in the course of business," and by reason of those words the criterion which I shall use in determining JAMA's financial situation on the several dates here in question will not be, what might be called, the static test of whether its balance sheet on the date of the transfers which are attacked showed red, but, what might be called, the kinetic test of whether having regard to the amount and maturities of its obligations and the amount and nature of its assets, it might—as a going concern—have been expected to realize on its assets in the existing market so as to meet its obligations as they fell due.

D. In the light of this criterion I shall now chancer, as far as necessary, the value of JAMA'S assets during 1931 and 1932 in relation to its impending liabilities on the several dates when the transfers which are attacked herein occurred.

(a) The value of JAMA'S assets, of which the value is disputed, I fix, as of the times hereinafter indicated, as follows:

1. *The Brookville Mortgage:*

Mr. A. L. Smith had bought a house and circa 70 acres of land at Brookville, Long Island, from Harriman in 1929 for $625,000, paying $300,000 in cash and giving Harriman a purchase-money mortgage for $325,000.

The defendant's expert contends that in 1931 and 1932 the mortgage was worth its face, $325,000. The plaintiff's expert fixes its value at $295,000. Neither had sold mortgages on land in that neighborhood at or about this time.

The market for large places like this, on the North Shore of Long Island, had depreciated between 1929 and 1931 at least 50 per cent. In 1932, it was about the same, but in 1934 market for properties thereabouts was better than it was in 1932.

---

* "§ 271. *Insolvency.* 1. A person is insolvent when the *present fair salable value* of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." (Italics mine.)

The expert called by the plaintiff fixed the value in 1931 of the real estate on which this mortgage was a lien at $295,000. The expert called by the defendant fixed it at $350,000. They both agreed that the value was substantially the same in 1931 and 1932.

I much preferred the evidence of the plaintiff's expert on this item and adopt his valuation for the real estate.

Mr. A. L. Smith died on May 20, 1934, leaving an estate of circa $772,000. In the latter part of 1934 a compromise on this mortgage was reached by the receiver with the executors of his estate, by which the executors paid the Bank the sum of $260,000. This sum is now held by the Bank subject to the result of my decision in this cause.

Putting the situation most favorably to the defendant, I think that a mortgage, which was in amount so near the value of the property as fixed by the defendant's expert, could not have been sold for its face value to an investor in mortgages in view of the market conditions then existing, in spite of its 5 per cent. interest and the solvency of Mr. Smith.

I should think it unlikely that this mortgage could have been sold in 1931 or 1932 to a third party at much more than the sum at which it was subsequently compromised by the receiver with the Smith estate in 1934, but I will fix its value at something more than the compromise figure which may have been due to the anxiety of the Bank to realize on its collateral as promptly as might be.

Therefore, on conflicting evidence, I fix the value of the Brookville mortgage as a salable asset of JAMA during 1931 and 1932 at $275,000.

2. *Furniture, Tapestries and Works of Art:*

The furniture, tapestries, and works of art owned by JAMA were carried on its books as worth $252,219.60.

The appraiser for the defendant is perhaps more experienced than the appraiser for the plaintiff. Furthermore, he made the appraisal which was used on the chattel mortgage, above mentioned, and therefore had knowledge of all the items under consideration in this heading. But he thinks that these items could have been sold in 1931 for circa $165,000, and in 1932 for circa $145,000, which it seems to me is too high a price.

The plaintiff's appraiser fixed the value for the items under this heading at very much less. I think perhaps he fixed them too low; but it was testified to that the antique dealers were not operating any "knock outs" in 1931 and 1932, and that this meant lower prices for all antiques sold at auction.

The reason for this was that the antique dealers were short of money, and if they spent any money they had difficulty in reimbursing themselves by selling the articles they had bought. This combination of poor turnover and short funds made the antique market very weak in 1931 and 1932.

On conflicting evidence, I fix the gross sale value for the items under this heading at $125,000 for 1931, and $100,000 for 1932.

3. *Shares in a Co-operative Apartment Corporation Called 2 East Seventieth Street Corporation and Accompanying Proprietary Lease:*

This asset of JAMA'S consisted of 1,530 shares of a co-operative apartment corporation owning the building at 2 East Seventieth street. These shares carried with them a lease to the seventh and eighth floors in the said building. The maintenance charge on the tenant under the lease was $16,000 a year, and the landlord, by the provisions of the articles of incorporation, had a lien on the shares of stock for any indebtedness by the tenant.

A similar apartment could have been rented for much less, and the plaintiff's real estate expert considered that there was not any value for JAMA in the ownership of this lease, especially as the lease ran for almost 99 years, and any purchaser thereof would have to assume the heavy obligation involved in it for that period of time.

The defendant's real estate expert contended that the fair and reasonable value of this proprietary lease on October 13, 1931, was $48,300, and that the same was true in 1932 on the various dates in which we are here interested. He admitted that he did not think it could have been sold to any one in 1931 for that amount on account of the high maintenance charges. He thought, however, that in 1931 and 1932 the public did not realize how bad real estate conditions were and that the stock and lease might have been sold for something.

I hold, on this conflicting evidence, that in view of the maintenance charge of

$16,000 a year, for which the purchaser would have had to obligate himself for the long term of the lease, that this lease and its accompanying shares of stock in the 2 East Seventieth Street Corporation had not any asset value to JAMA at any of the times here involved.

4. *Equity in 20 East 54th Street:*

This is a five-story building which fronts 26 feet on the south side of East Fifty-Fourth street between Fifth and Madison avenues on a lot 105 feet deep.

On this property there was a $50,000 mortgage, paying interest at 5 per cent., held by the United States Trust Company.

The property was leased under a net lease to the Baldwin Piano Company at a rental of $12,000 a year for twenty-one years, stepping up in 1936 to $13,000. The Baldwin Piano Company was in good condition financially and paid its rent and taxes promptly.

In 1931 the land had an assessed value of $175,000, the building $50,000, making a total of $225,000.

In 1932, the land was assessed at $155,000, and the building at $45,000, making a total of $200,000.

The plaintiff's real estate expert stated that the market value of the land and building, both in 1931 and 1932, was $110,000.

In view of the mortgage of $50,000, this gave the property an equity value to JAMA of $60,000.

In the opinion of the plaintiff's expert, properties of this kind were declining in value in 1932, and he thought the fair rental value at that time of 20 East Fifty-Fourth street was not more than $9,000 a year.

The building was actually sold, subject to the mortgage, by the Bank's receiver to the Baldwin Piano Company in 1934, when the real estate market had somewhat improved, for $108,500. That, of course, should not be considered on the same basis as a sale by a seller free to bide his time.

After deducting the mortgage and commission, there is now being held in escrow by the receiver, subject to the result of this suit, the sum of $55,267.77.

The defendant's real estate expert said that in his opinion a reasonable market value of the premises in October, 1931, was $185,000, leaving an equity, after deducting the $50,000 mortgage, of $135,000. He said the value was the same throughout 1932.

He based this on the fact that there was a solvent tenant for the whole building under a net lease which provided that the tenant should pay any taxes and any other upkeep, which would have meant, if the property were purchased at $185,000, a return to the purchaser of 7½ per cent. on his money.

The market for real estate in Manhattan was very slow, however, in 1932, and finally on cross-examination, the defendant's expert weakened a little and admitted that he thought the property might have been sold for not less than $150,000 to $160,000. Out of that, of course, the purchaser would have had to pay the mortgage interest at 5 per cent. on $50,000, amounting to $2,500 a year.

It seems to me that on these figures, having regard to the admittedly slow real estate market in 1931 and 1932, it is fair to fix the reasonable market value of the property on a negotiated sale in October 1931, or during 1932, at $125,000, leaving an equity to JAMA after deducting the amount of the mortgage lien of the United States Trust Company and, for the moment, disregarding all other liens, of circa $75,000.

5. *Account No. 14-A with Harriman & Company:*

This account was a deposit account which was long maintained by JAMA with Harriman & Co., a firm of brokers. In it on October 13, 1931, there was an apparent credit balance of $459,908.70.

The plaintiff says that the asset value of this account had been destroyed by Harriman's having put it in hotchpotch with his other accounts at Harriman & Co. by a letter, dated October 17, 1930. I agree.

That letter read as follows:
"Messrs. Harriman & Company,
  "111 Broadway,
  "New York, N. Y.
"Gentlemen:
  "I hereby consent that any and all collateral or credits of any kind or description now to my credit with you, or which may hereafter be to my credit, may be used by you in any or all accounts wherein I may be interested, or in any account which I have opened or which may hereafter be opened by me, or in which I may have an interest, for the same purposes as mentioned and described in my signature contract now on file in your of-

fice, which signature contract is made a part hereof. The accounts now open are the following: J. W. H., No. 14, No. 14-A, Jama Corp., J. W. H. A/c O. H., and J. W. H. Seat.

"Very truly yours, .
"J. W. Harriman

"Date October 17, 1930."

On October 17, 1930, no question of JAMA'S solvency had arisen, and Harriman had authority from JAMA to write this letter.

By October 13, 1931, almost a year later, there were too many estoppels in Harriman & Co.'s favor as a result of their continuing business with Harriman in reliance on this letter until he became hopelessly insolvent, to enable JAMA, as defendant's counsel contends, by declaring its ownership of the account, to have it segregated as a separate available asset. I, therefore, hold that this account did not have any asset value to JAMA on October 13, 1931.

6. *The Notes of J. W. Harriman and E. W. Hughes:*

On October 13, 1931, Harriman owed JAMA $965,831.14, and E. W. Hughes, Harriman's confidential secretary, owed JAMA $502,600. Harriman at the time was himself hopelessly insolvent and Hughes was not a person of any substance, so neither he nor Harriman could have paid anything on account of the notes, and to have realized anything from them would have certainly required a litigation and probably in either case a proceeding in bankruptcy.

I do not think, therefore, that these notes can be regarded as salable during the period under consideration except in so far as a speculator might have been willing to buy them for some small amount on the chance of realizing something out of them.

I, therefore, hold that neither of these notes had any asset value to JAMA on October 13, 1931.

7. *The Bank Stock:*

On October 13, 1931, JAMA was the registered owner of 3,059 shares of stock in the Bank, with each of which a share of the Securities Corporation was affiliated.

In October, 1931, there was not any free market for this Bank stock. The market prices for the stock had been ar-

tificially maintained from December 28, 1929, at the Bank's expense—as has been above mentioned,—and in October, 1931, the price of the stock stood at between $1,390 and $1,480 per share.

There is, therefore, no real market value by which I can chancer the Bank stock, and I will have to take the next best available norm by which to measure its value. Cf. United States v. Wishnatzki (D.C.) 7 F.Supp. 313, and cases there cited; reversed on other grounds 77 F. (2d) 357 (C.C.A.2).

Proceeding on this basis, I find that I have the following figures by which to check what is a fair valuation for the Bank stock as of October 13, 1931:

First, I have, as a minimum price, the book value of the Bank stock and its affiliated Securities Corporation stock, which was fixed by the examiner for the Clearing House, Mr. Hanna, on corrected figures, at $160 per share for the Bank stock and $33 per share for the Securities Corporation stock, making a total for the affiliated unit of $193 per share.

Second, I have another and somewhat higher value which is the value that might have been given to the affiliated stock if some larger bank had been intending to merge the Harriman Bank with itself. In such an event allowance would have been made for the good will of the Bank, which was not inconsiderable at this time; for it had occupied a very strategic position at the southeast corner of Forty-Fourth street and Fifth avenue for upwards of twenty-five years, and in October, 1931, it was in good repute and remained so until the unfortunate events with which we are in part concerned on this trial, and which led eventually to its being closed.

Mr. Henry E. Cooper, who was put in charge of the Bank by the Clearing House in July, 1932, as president in succession to Harriman, is an experienced banker, and he testified that whenever a merger of banks was to be made there would always be an allowance for good will of at least 5 per cent. of the deposits, and that some times larger percentages were allowed.

Now the deposits in the Bank amounted in October, 1931, to about $35,000,000. The capital funds of the Bank, at Hanna's revised figures, amounted to $3,208,000. Five per cent. of the deposits would have amounted to $1,750,000. This amount added to the capital funds makes a total of $4,958,000. Dividing this sum by the 20,-

000 shares of stock outstanding would have given what I call a fair merger value of the Bank stock alone at $247.90 per share.

Third, I have a reconstructed free market value which is worked out mathematically on a graph and which may be thus shortly described:

Counsel for the defendant, realizing the difficulty of the problem which was presented in any attempt to value the Bank stock in this cause owing to its having no free market, had a graph made based on the records of the Commercial and Financial Chronicle showing the actual course of prices of the stocks of a number of Clearing House Banks† from October 5, 1929, to March 4, 1933, based on an average between the daily bid and asked quotations.

As there was no free market for the Bank stock between December 28, 1929, and May 17, 1932, all that could be shown on the graph (Defendant's Exhibit JJJ), so far as the stock of the Harriman Bank was concerned, was the trend which the Harriman Bank stock expectably would have followed if it had been free to react to the economic weather encountered by it as all other bank stocks did.

This trend is indicated on the graph by a dotted line, slanting downward from left to right, as did the trend of actual prices of the stock of the other banks on the chart.

It is also shown by the graph that after the market for the Harriman Bank stock was freed on May 17, 1932, it dropped within about six weeks almost perpendicularly from about $1,210 to below $245, and then rose and stabilized itself for several weeks in the neighborhood of $250 a share. Then, after the fact that the July dividend on the Bank stock and its affiliated Securities Corporation had been passed became known and began to affect the market, the stock dropped still more until eventually it turned out to be practically valueless.

Defendant's counsel has used this graph to reconstruct the situation, so as to determine what would have been the probable market value of the Bank stock in a free market on October 13, 1931, assuming that the Bank stock had followed the decline in actual price which was shown by the other bank stocks indicated on the graph. He finds that this probable market value would have been about $357.50 per share including the affiliated share of the Securities Corporation stock.

I think this theory of reconstruction of the free market value of the Bank stock is extremely ingenious, and, whilst it might not be considered to have sufficient accuracy to fix the value at the precise amount suggested, if a question of damages were involved, it has, I think, great value in indicating at least the upper limits of what the price of the stock in a free market would have been.

Certainly this reconstructed market value of $357.50 per share is the highest figure I could properly put on the stock of the Bank, except on the theory that, if JAMA had started to sell the stock, the directors of the Bank, owing to a syndicate agreement which existed among them, would have bought it at higher prices than that suggested in order to prevent its dragging the market down. This syndicate agreement was a cushion, which was, to put it in the most polite form, somewhat irregular, but which might have meant something in maintaining JAMA'S solvency, as a matter of self-protection to the Bank, the Securities Corporation, and the participating directors; so it cannot be disregarded as a factor in the situation in October, 1931.

If we take the 3,059 shares of the affiliated stock owned by JAMA on October 13, 1931, at Mr. Hanna's corrected book value of $193 per share, we have a value for those shares of $590,387.

If we take the 3,059 shares of the affiliated stock owned by JAMA on October 13, 1931, at the so-called merger value of $247.90 per share, we have a value for those shares of $758,326.10.

If we take the 3,059 shares of the affiliated stock owned by JAMA on October 13, 1931, at the reconstructed market value of $357.50 per share, we have a value for those shares of $1,093,592.50.

On the criterion of solvency which I have adopted in this cause, I do not think that JAMA would have been required— if it had needed to sell its Bank stock in

---

† The banks referred to on the graph were the First National, Fifth Avenue, Guaranty Trust Company, National City Bank, New York Trust Company, Corn Exchange, Chase National, Bankers Trust Company, Manufacturers Trust Company, Chemical Bank & Trust Company, Irving Trust Company, and Continental Bank & Trust Company.

order to meet its earliest maturities—to cast all its Bank stock on the market at one time. Therefore, I think that if, after October 13, 1931, JAMA had marketed, in an unhurried and prudent fashion, such of its Bank stock as it was forced to sell in order to meet those maturities, it could have secured, in a free market, at least $350 per share.

Accordingly, I hold that the asset value of JAMA'S 3,059 shares of Bank stock on October 13, 1931, was at least $1,070,650.

(b) The assets of JAMA on October 13, 1931, of which the value is not in dispute, were:

| | |
|---|---:|
| Cash | $ 56,473.43 |
| Southern Railway common, 12,000 shares | 216,000.00 |
| French & Company, Account receivable | 10,460.00 |
| Elizabeth and Lawson C. Rich, Account receivable | 934.21 |
| 1170 Fifth Avenue Corporation, Cooperative Apartment, Lease and stock | 8,500.00 |
| High Farms, Glen Cove, L. I., House and land, equity | 6,183.50 |
| West Orange mortgage | 15,000.00 |
| Total | $313,551.49 |

E. On October 13, 1931, JAMA'S financial status was as follows:

(a) Its liabilities and their several maturities were:

collateral. The accrued items consisted of real estate taxes and interest on loans which had not yet become due.

Even on the plaintiff's somewhat arbitrary figures for the Bank stock, the liabilities of JAMA exceeded its assets on October 13, 1931, by only $76,218.20.

(b) The value of JAMA'S assets on October 13, 1931, as I have found them, exclusive of the Bank stock, is, therefore, as follows:

| | |
|---|---:|
| Undisputed items | $313,551.49 |
| Brookville mortgage | 275,000.00 |
| Furniture, tapestries, etc. | 125,000.00 |
| Equity in 20 East 54th Street | 75,000.00 |
| | $788,551.49 |

Whether I take the Bank stock at the book value which I found for it of $590,387, or the so-called merger value of $758,326.10, or at what I found was the minimum value of $1,070,650 for marketing it sedately pending the maturity of JAMA'S obligations, and add any of these sums to the assets above mentioned, it will be found that on October 13, 1931, JAMA was clearly not insolvent or imminently likely to become insolvent.

For in either of the first two figures there was ample margin of assets over liabilities and, on the last figure, which I think is the fairest one to take, there was a balance of assets over liabilities of $644,733.15, for the assets of JAMA on Octo-

## Loans Payable

| Creditor | Amount | Maturity |
|---|---:|---|
| Harriman Bank | $  150,000 | December 7, 1931 |
| Harriman Bank | 195,000 | January 11, 1932 |
| Harriman Securities Corp. | 400,000 | January 11, 1932 |
| Kings County Trust Co. | 190,000 | February 3, 1932 |
| Chase National Bank | 250,000 | February 4, 1932 |
| | $1,185,000 | |

## Other Creditors

| | |
|---|---:|
| E. F. Hutton | 17,960.10 |
| Harriman & Company | 5,170.64 |
| Accrued Items | 6,337.60 |
| | $1,214,468.34 |

The loans to the Chase National Bank and the Kings County Trust Company were unsecured, and the liabilities of JAMA to E. F. Hutton & Co. and Harriman & Co. were debit balances against which the said stock brokers held adequate

ber 13, 1931, were $1,859,201.49, and its liabilities were $1,214,468.34.

F. May 17, 1932, is one of the dates on which it was claimed at the trial that the solvency of JAMA was a matter of importance.

(a) On May 17, 1932, the liabilities of JAMA and the maturities of its obligations were as follows:

| Creditor | Loans Payable Amount | Maturity |
|---|---|---|
| Augusta B. Harriman | $  30,000.00 | Demand |
| National City Bank | 150,000.00 | June    15, 1932 |
| Harriman National Bank | 150,000.00 | July      6, 1932 |
|  | 195,000.00 | July    11, 1932 |
| County Trust Company | 100,000.00 | July    18, 1932 |
| Harriman Securities Corp. | 100,000.00 | July    22, 1932 |
| Union Trust Co. of Maryland | 50,000.00 | August 2, 1932 |
| Rochester Bank | 50,000.00 | August 2, 1932 |
| Chase National Bank | 100,000.00 | August 4, 1932 |
| Kings County Trust Co. | 190,000.00 | August 4, 1932 |
|  | $1,165,000.00 |  |

Other Liabilities

| | | |
|---|---|---|
| E. F. Hutton & Co. | 32,665.56 | |
| Accrued Items | 8,236.47 | |
|  | $1,205,902.03 | |

(b) On May 17, 1932, JAMA'S only free assets, other than its Bank stock, with which to meet these liabilities, were its equity in the real estate known as High Farms at Glen Cove, Long Island, the West Orange mortgage, and its furniture, tapestries, and works of art. These assets were not easily marketable at that time.

On May 17, 1932, therefore, under the criterion I am using, the question of JAMA'S solvency turns on the value of its Bank stock as a marketable asset just as it did on October 13, 1931.

It was on May 17, 1932, that the market for the Bank stock was made free But this was not known to the public at once, and what I might perhaps appropriately call the momentum of the artificial market continued for some days.

The Bank stock sold in single share lots up to May 23, 1932, at prices ranging down from $1,210 to $1,175 per share. Then up to June 23d, there were scattering sales of single share lots at prices ranging downward from $800 to $550. Then the stock dropped still further with occasional rallies, mostly on sales of single shares or very small lots, until about the 28th of June, and then the price held fairly steady at around $240 and $250 for several weeks.

However, as an asset with which to meet maturities the Bank stock was, I think, in an especially precarious situation at this time; for the examination by Mr. Hanna, in behalf of the Clearing House, showed that in April, 1932, it had a book value of only $11 per share before setting up reserves for doubtful accounts, and no book value whatever when such reserves had been set up. The stock of the Securities Corporation also had no book value at that time.

The situation of the Bank had, therefore, not changed for the better between October, 1931, and May, 1932. But until after June 30, 1932, the figures showing the situation as of that date had not been made public and the Bank stock sold, as above indicated, in a free market for some days after May 17, 1932, in small lots, at prices which perhaps were more extraordinary having regard to its lack of intrinsic value than the prices in the artificial market had been. Marketwise, however, the Bank stock was obviously doomed to a steady decline after the report of June 30th came out and after the July dividend was passed, though it held up pretty well until the latter part of July.

Throughout the period which I have just been discussing, as I have indicated, only small lots of Bank stock were sold—only a share or two a day—and the market was not only narrow but obviously soft and quite incapable of absorbing a large amount of stock except at very much lower prices than the small lots commanded.

I say this despite the fact that, even in August, after the poor report of the

Bank as of June 30, 1932, had been made public and its July dividend had been passed, the County Trust Company was able to sell, in several lots, 343 shares of Bank stock held as collateral to its note without depressing the market more than five points, from about $105 to $100.

I think the highest value which I can possibly put on the Bank stock on May 17, 1932, for sale to meet JAMA'S maturities is not more than $200 per share, and that only would have held I think provided it had been offered for sale gradually.

Fixed at this amount, which, as implied, is on the high side, the 3,659 shares of Bank stock held by JAMA on May 17, 1932, would have had a value of $731,800.

With the Bank stock fixed at this value, the assets of JAMA on May 17, 1932, were as follows:

| | | |
|---|---|---|
| Cash in Harriman Bank.... | $ | 29,201.64 |
| Cash on hand.............. | | 1,000.00 |
| Securities: | | |
| 3659 shares of Bank stock at $200 per share.... | | 731,800.00 |
| 700 shares of Anaconda Copper Company stock | | 2,800.00 |
| Accounts and Loans Receivable: | | |
| From Harriman & Company .................. | | 30,062.21 |
| French & Company....... | | 4,930.10 |

| | |
|---|---|
| Elizabeth and Lawson C. Rich ................. | 1,765.83 |
| Equity in Real Estate: | |
| 1170 Fifth Ave.—Lease and Stock............. | 8,500.00 |
| 20 East 54th Street....... | 75,000.00 |
| High Farms, Glen Cove, L. I................... | 6,916.00 |
| Mortgages Receivable: | |
| A. L. Smith............. | 275,000.00 |
| West Orange (Santos D'Alia) ............... | 15,000.00 |
| Works of art, furniture, etc. (1932) ................. | 100,000.00 |
| Accrued Items ............ | 1,992.37 |

| | |
|---|---|
| Total ........ | $1,282,067.85 |
| Deducting the liabilities above shown of .......... | $1,205,902.03 |

| | |
|---|---|
| The balance of assets above liabilities, therefore, is only ................... $ | 76,165.82 |

For the reasons above given, it is, I think, abundantly clear that, even if JAMA was not technically insolvent on May 17, 1932, on the valuations which I have given to its assets, its insolvency was obviously imminent, and I so find.

G. On July 25, 1932, JAMA'S situation was still worse.

(a) JAMA'S liabilities then were as follows:

LOANS PAYABLE

| Creditor | Amount | Maturity | | |
|---|---|---|---|---|
| Augusta B. Harriman | $ 30.000 | Demand | | |
| Union Trust Co. of Maryland | 50,000 | August | 2, | 1932 |
| Rochester Bank | 50,000 | August | 2, | 1932 |
| Chase National Bank | 100,000 | August | 4, | 1932 |
| Kings County Trust Co. | 190,000 | August | 4, | 1932 |
| Marie Therese Dixon | 75,000 | September | 29, | 1932 |
| Harriman National Bank | 150,000 | October | 4, | 1932 |
| | 195,000 | October | 11, | 1932 |
| Union Trust Co. of Maryland | 50,000 | October | 11, | 1932 |
| County Trust Co. | 100,000 | November | 17, | 1932 |
| Union Trust Co. of Maryland | 50,000 | November | 25, | 1932 |
| M. H. O. Co., Inc. | 150,000 | December | 14, | 1932 |
| Harriman Securities Corp. | 100,000 | January | 22, | 1933 |
| | $1,390,000 | | | |

OTHER LIABILITIES

| | |
|---|---|
| E. F. Hutton & Co. | 33,065.12 |
| E. and L. C. Rich | 2,277.29 |
| Accrued Items | 11,554.92 |
| Total | $1,436,897.33 |

The price of the Bank stock between July 23 and July 25, 1932, sold in the then free market in small lots, if calculated on a weighted average of sales, amounted to $152.50 per share.

But I do not think that this figure represents a price which can be considered in deciding the value of JAMA'S Bank stock on this date. I think—for the reasons herein above given in regard to the market for the stock of the Bank after the passing of the July dividend—that, if, in order to meet its early maturities, JAMA had tried to sell any substantial portion of its Bank stock during August and September, it would not have been able to sell it for more than $100 per share.

(b) The assets of JAMA on July 25, 1932, therefore, were as follows:

| | |
|---|---|
| Cash in Harriman Bank | $ 5,516.28 |
| Cash on hand | 1,000.00 |
| Securities: | |
| 3556 shares of Bank stock at $100 per share | 355,600.00 |
| 700 shares of Anaconda Copper Co. | 2,800.00 |
| Accounts and Loans Receivable: | |
| Harriman & Co. (JAMA'S account) | 30,421.85 |
| French & Co. | 5,596.20 |
| Equity and Real Estate: | |
| 1170 Fifth Avenue—Lease and stock | 8,500.00 |
| 20 East 54th Street | 75,000.00 |
| High Farms | 6,916.00 |
| Mortgages Receivable: | |
| A. L. Smith | 275,000.00 |
| West Orange (Santos D'Alia) | 15,000.00 |
| Works of Art, Furniture, etc. | 100,000.00 |
| Accrued Items | 5,482.40 |
| Total | $886,832.73 |

On July 25, 1932, JAMA'S liabilities were ............ $1,436,897.33

Therefore, the liabilities of JAMA on this date exceeded its assets by ........ $ 550,064.60

It was hopelessly insolvent, and there was not a chance of its meeting its obligations at their maturities.

### H. The First Suit—Equity 78—44:

■ In Irving Trust Company v. Chase National Bank, 72 F.(2d) 668 (C.C.A.2), the Circuit Court of Appeals laid down the essentials to be proved by a plaintiff who desires to set aside an alleged preference on the ground that it is in contravention of section 15 of the New York Stock Corporation Law as follows:

1. That insolvency existed or was imminent at the time when the transfers or payments were made;

2. That the transfers or payments resulted in a preference;

3. That the transferee at the time of the transfers or payments were received had notice or reasonable cause to believe that the transfers would effect a preference; and

4. That an intent existed on the part of the insolvent to give a preference to the transferee.

To the same effect, see Emerson v. Berman, 57 F.(2d) 637, 639 (C.C.A.2).

■ When Mr. Cooper forced Harriman on July 25, 1932, to sign a collateral note for $100,000, to cover the money which had gone to JAMA via Levin, as above described, and to give the Bank as collateral therefor: An assignment of the West Orange mortgage; a deed to the High Farms property; a chattel mortgage on certain works of art, etc.; and 200 shares of Bank stock—his purpose was to strengthen the Bank's position, and he wholly disregarded the position of JAMA vis-a-vis its other creditors.

This was a perfectly natural thing for Mr. Cooper to do, but I think that before doing it, he should have investigated the situation in so far as JAMA'S condition was concerned. That, of course, is not the way in which creditors proceed when they see a chance to get security for an indebtedness, but, nevertheless, in a situation of this kind, as the new president of the Bank, Mr. Cooper in effect turned his back on easy opportunities of investigating JAMA'S situation and took for the note all the security which he could force Harriman to give.

I think this is a fair comment on what occurred, because, whatever Mr. Cooper's actual personal knowledge may have been, the Bank must be held to have had knowledge—

1. That JAMA had registered in its name at this time 3,556 shares of Bank stock;

2. That the market for the Bank stock was no longer protected and was steadily going down;

3. That the Bank stock had not any intrinsic value as shown by Mr. Hanna's report; and

4. That, before Mr. Cooper forced the issue on the Levin situation, the Bank had all JAMA'S property as collateral for the indebtedness owed to it by JAMA, except the High Farms property at Glen Cove, the West Orange mortgage, and the furniture, works of art, etc., and the Bank stock.

That Mr. Cooper knew he was squeezing out of JAMA its last free assets which gave promise of any future value is I think further clearly shown by the fact that among the collateral mentioned in the note of July 25, 1932, in addition to the items just mentioned, he took 200 shares of the Bank's own stock which Harriman contributed and which can at least be called an astonishing bit of collateral for the Bank to take, even for a past indebtedness.

I think it is obvious under these circumstances that the Bank, as a matter of law, must be held to have had reasonable cause to believe that it was securing a preference for itself by taking the collateral which Mr. Cooper thus exacted from Harriman, and that Harriman knew he was thereby giving a preference to the Bank.

Consequently, inasmuch as the insolvency of JAMA on July 25, 1932, is perfectly clear under the criterion which I have used, the plaintiff is entitled to recover the collateral thus turned over by it to the Bank on July 25th.

■ I do not allow any offset in the Bank's favor to this recovery for to do so would make effectual the preference which I have found it sought to secure. Irving Trust Company v. Frimitt (D.C.) 1 F. Supp. 16, 17.

In the first suit, therefore, the plaintiff may have a decree.

I. *The Second Suit, Equity 78–56:*

■ In respect of the transfers made on October 13, 1931, by JAMA to the Bank, I think it is perfectly clear that the Bank was not then insolvent or imminently in danger of becoming insolvent, and that, therefore, the second suit must be dismissed.

J. *The Third Suit, Equity 78–115:*

In what I have called suit No. 3, we have a somewhat complicated situation which is a typical illustration of Harriman's methods and which requires a somewhat detailed consideration.

1. This suit was originally brought by the plaintiff as trustee of JAMA, not only against Goess as receiver of the Bank, but also against the Irving Trust Company as trustee in bankruptcy of the Securities Corporation.

On November 23, 1934, however, a general settlement was arrived at between the said two trustees, with the approval of the bankruptcy court, on the basis that the Irving Trust Company, as trustee in bankruptcy of the Securities Corporation, should pay $1,500 to the plaintiff, as trustee of JAMA, and, at the same time, should waive any and all claims on the notes which JAMA had given to it in the sum of $100,000 and which had never been paid.

As a result of this settlement, and on or about the date thereof, the plaintiff executed and delivered to the Irving Trust Company a general release containing a recital of the terms of the settlement above indicated, and the Irving Trust Company did not file any claim in bankruptcy against JAMA.

As this litigation now stands, therefore, the plaintiff has to find a basis by which it may impress liability directly on the Bank in order to maintain any recovery herein.

2. Prior to the times hereinafter mentioned, JAMA owned in fee, subject to the lien of a mortgage in the principal sum of $50,000 held by the United States Trust Company, certain premises at 20. East Fifty-Fourth street, which, as above noted, I have valued, as of 1932, at $125,000.

On October 13, 1931, it will be remembered, JAMA borrowed $400,000 from the Securities Corporation, giving its collateral note therefor. It gave to the Securities Corporation, inter alia, as collateral on that note—apparently for the purpose of evading mortgage taxes under the Tax Law of New York State (chapter 62 of the Laws of 1909, as amended, Consol. Laws, c. 60) §§ 250 to 267—an absolute deed to said premises at 20 East Fifty-Fourth street.

■ Under New York law such a deed when so given, although absolute in form, is—from the point of view of an equity court—in effect a mortgage, and as such does not transfer the land involved but gives to the mortgagee or transferee merely a lien thereon as security for the debt

incurred. Cf. Macauley v. Smith, 132 N.Y. 524, 531, 30 N.E. 997; Shattuck v. Bascom, 105 N.Y. 39, 43, 12 N.E. 283; Odell v. Montross, 68 N.Y. 499, 503.

By December 31, 1931, JAMA had repaid the Securities Corporation in full for the loan above referred to and the mortgage lien thus attached to the property at 20 East Fifty-Fourth street, had, therefore, been discharged.

I think it may be properly inferred from the evidence herein, and I find, that on or about that date the Securities Corporation returned to JAMA the above-mentioned deed of October 13, 1931, which for convenience will be hereinafter referred to as the "deed-mortgage."

3. On March 22, 1932, the Securities Corporation made a new loan to JAMA of $50,000, taking therefor a collateral promissory note in which the land and building at 20 East Fifty-Fourth street was named as collateral, and with which the deed-mortgage was again delivered to the Securities Corporation.

On April 4, 1932, JAMA borrowed $50,000 more from the Securities Corporation and the said deed-mortgage was also put in as collateral under the note for this loan.

From April 4th until May 17, 1932, the said deed-mortgage was held as collateral for this total indebtedness of $100,000 from JAMA to the Securities Corporation.

4. In view of these facts, it seems to me that the proper way of looking at the status of the deed-mortgage during the period from December 31, 1931, to March 22, 1932, is not to assume, as is suggested by defendant's counsel, that JAMA—by some process which I confess I am wholly unable to imagine—kept it alive ad interim as a mortgage, but to hold that it was taken back by JAMA and filed away as a convenient instrument which could be used in the future, if necessary, for a purpose similar to that for which it had already been used in October, 1931. Accordingly I so find.

When, therefore, JAMA came to borrow more money from the Securities Corporation, instead of executing at that time a mortgage on 20 East Fifty-Fourth street, or a new deed-mortgage thereto, it again used the old deed-mortgage of October 13, 1931, as collateral, and thus a wholly new mortgage lien on 20 East Fifty-Fourth street in favor of the Securities Corporation was created by this new use of the old instrument as security for the amount of its loans to JAMA of March 22 and April 4, 1932.

This new lien, in effect, constituted a new second mortgage on 20 East Fifty-Fourth street, subordinate only to the lien of the first mortgage held by the United States Trust Company.

5. Whatever JAMA'S condition was in March and April, 1932, this lien thus acquired by the Securities Corporation would not have been subject to attack under section 15 of the Stock Corporation Law because it was acquired for present advances, and not for an antecedent debt. Nor could it have been attacked under article 10 of the Debtor and Creditor Law (section 270 et seq.) because it was a lien given as security for present advances of $100,000, and its value was not disproportionate to the amount of such advances; for, as I have valued 20 East Fifty-Fourth street in 1932 at $125,000—after deducting the first mortgage held by the United States Trust Company—JAMA had an equity of only $75,000 therein before mortgaging it to the Securities Corporation for its March and April loans.

6. Therefore, after that mortgage, the situation was that JAMA owned the fee to 20 East Fifty-Fourth street, valued at $125,000, subject to two mortgage liens; First, that of the United States Trust Company in the principal sum of $50,000; and, second, that of the Securities Corporation in the principal sum of $100,000.

Consequently, JAMA did not have any equity in 20 East Fifty-Fourth street at any time after April 4, 1932.

7. Harriman's personal loan from the Bank had been under criticism in April, 1932, by the bank examiners on the ground that it did not have sufficient collateral.

Apparently it was to get more collateral for his own purposes that Harriman on May 17, 1932, caused the Securities Corporation to execute and deliver to the Bank a deed to 20 East Fifty-Fourth street, and, at the same time, to turn over to the Bank the deed-mortgage of October 13, 1931, which, as mentioned above, it had, for a second time, received on March 22, 1932, from JAMA as a new mortgage lien.

Then Harriman caused the Bank to put the two instruments as security under his personal loan from the Bank.

The only interest which the Securities Corporation then had in the property at 20 East Fifty-Fourth street was a mortgage lien for $100,000 thereon, and the only effect which the deed of May 17, 1932, by which it purported to convey those premises to the Bank, could have had, therefore, was to assign this lien to the Bank. There was not, however, any transfer of the notes secured by this lien.

8. Counsel for the defendant makes the ingenious suggestion that this transaction of May 17, 1932, was a novation involving a tripartite agreement (engineered by Harriman) between JAMA, the Securities Corporation, and the Bank. But I do not agree, for I do not think that, by what happened, any new direct relationship was established.

After long reflection on the facts involved, it seems to me that the correct diagnosis of the transaction is that the Securities Corporation agreed with JAMA to take the lien of its mortgage on 20 East Fifty-Fourth street out from under JAMA'S loan and transfer it to the Bank in consideration of an agreement by JAMA to put different collateral in its place. This was done. in July, .1932, when Harriman caused JAMA to put other collateral—partly owned by JAMA and partly borrowed from August Heckscher and J. Rich Steers—under its note for $100,000 then still outstanding with the Securities Corporation.

█ Legally there was not any obstacle to such an arrangement for there is not any reason whatever—when both mortgagor and mortgagee consent—why the lien which the mortgagor has given to the mortgagee, may not be divorced from the mortgagor's obligation, if the parties so desire. This is a question of intent in a zone of free contract, and is not trammeled by any hard and fast rule of real estate law. Cf. Salvin v. Myles Realty Co., 227 N.Y. 51, 55, 56, 124 N.E. 94, 6 A.L.R. 581; Hubbell v. Blakeslee et al., 71 N.Y. 63, 70; Star v. Ellis, 6 Johns.Ch. (N.Y.) 393, 395, 396.

Practically, however, there was the difficulty that unless the new collateral put under JAMA'S note for $100,000 was as good as the former collateral, the result might be that the Securities Corporation would have a larger unsecured claim against JAMA in respect of that note than it might have had under the first arrangement with the resultant effect of de-creasing the dividends in bankruptcy received by JAMA'S other creditors. But any difficulty that might arise from such a result has been precluded by the settlement between JAMA and the Securities Corporation, above referred to, whereby the Securities Corporation waived all claims in respect of its loans to JAMA.

9. It is common ground:

█ (a) That there was not any transfer of 20 East Fifty-Fourth street directly from JAMA to the Bank on that date or at any other time;

(b) That the Securities Corporation was not a mere agency of the .Bank, but was a separate entity; and

(c) That the Securities Corporation was then in debt to the Bank in an amount greater than its lien on 20 East Fifty-Fourth street.

I have found that on May 17, 1932, the insolvency of JAMA was imminent. But it is clear there was not, and never has been, any one before me in this litigation who has a locus standi to set aside the conveyance of the deed-mortgage from the Securities Corporation to the Bank as a preference under section 15 of the New York Stock Corporation Law, for the Securities Corporation never was a party plaintiff herein.

█ The situation is not better for the plaintiff on any theory that there was an actual transfer with JAMA'S consent of 20 East Fifty-Fourth street by the Securities Corporation to the Bank, that such a transfer would have been in fraud of JAMA'S creditors, and that it can, therefore, be set aside under the provisions of article 10 of the Debtor and Creditor Law. The reason for this is that on May 17, 1932, JAMA did not have any equity whatever left in the property at 20 East Fifty-Fourth street, and, therefore, its assets available to creditors were not depleted by any transfer thereof to whomsoever or for what purpose soever it was made. Cf. Glenn on Fraudulent Conveyances, §§ 195, 199.

Consequently, even on this theory, the plaintiff's claim as JAMA'S trustee in bankruptcy in respect of 20 East Fifty-Fourth street can never rise to a status higher than that of an injuria absque damno.

10. The fact that, after the transfer of May 17, 1932, Harriman, acting in his own interest, used the deed-mortgage and

its accompanying conveyance to the Bank as security under his personal loan with the Bank, and the fact that more than two years later JAMA settled its differences with the Securities .Corporation, are immaterial here, because my decision must turn, not on what happened to this bit of collateral after it reached the Bank, or what happened between JAMA and the Securities Corporation in an obvious attempt to create a situation more favorable to JAMA than the former situation actually had been, but on the answers to the questions:

(a) Whether on May 17, 1932, the Bank got from the Securities Corporation a mortgage lien on 20 East Fifty-Fourth street?

(b) And whether that lien was then vested in the Bank in such fashion as will prevent JAMA from now recapturing its property to which that lien was attached?

Both these questions must be answered in the affirmative.

By the borrowing resolution, which JAMA passed on January 26, 1923, and lodged with the Bank on January 7, 1930, it gave to Harriman, as its president, the right to pledge its property as he saw fit and gave the Bank a general lien on all JAMA'S property in its hands to cover any amount due to it from JAMA.

The property of JAMA which is now in the hands of the receiver of the Bank, and which will be left there undisturbed by my decision in this consolidated cause, namely, the proceeds of the settlement of the Brookville mortgage, the lease and stock of the co-operative apartment at 1170 Fifth avenue, and the net proceeds of the sale of 20 East Fifty-Fourth street, would not have sufficed to cover what JAMA owed to the Bank on May 17, 1932, and will be far less than sufficient to meet the indebtedness in the sum of $477,350.65 for which the Bank filed proof of claim in JAMA'S bankruptcy.

11. The judgment lien of the Rochester Bank for $50,394.90—with interest at 6 per cent. from the date of judgment November 16, 1932—which attached to the property at 20 East Fifty-Fourth street as a result of the filing in New York county on November 23, 1932, of the transcript of the Monroe county' judgment against JAMA, is junior to the liens of the Securities Corporation which attached in respect of $50,000 on March 22, 1932, and in respect of $50,000 on April 4, 1932, and which were transferred to the Bank as above found.

12. The Bank has now foreclosed on 20 East Fifty-Fourth street the lien which it got from the Securities Corporation in the manner above described by selling the property pursuant to a tripartite without prejudice stipulation between the plaintiff, the defendant, and the Rochester Bank, intervener herein, and there is now on deposit with the Bank, abiding under the said stipulation the result of this suit, the sum of $55,264.77, the balance of the proceeds of the sale of 20 East Fifty-Fourth street, after the payment of the first mortgage and interest thereon, and the charges incidental to the sale thereof.

13. For the reasons above given, since the first mortgage has been paid, the claims of the several parties to this cause in respect of this fund and their several priorities if applied to the land which the fund represents are:

(a) The receiver has a mortgage lien in the principal sum of $100,000;

(b) The Rochester Bank has a judgment lien in the principal sum of $50,000; and

(c) JAMA is owner of the land in fee but without any equity left therein.

14. I hold, therefore, that under the circumstances here shown, the Bank is entitled to retain the whole of the fund representing the proceeds of 20 East Fifty-Fourth street, and that the' claims of both the plaintiff in Suit No. 3, and of the Rochester Bank, as intervener therein, must be dismissed.

IV. The first three of the seven suits in this consolidated cause are obviously of equitable cognizance and have been disposed of by what has already been said in this opinion. The remaining four suits in this consolidated cause should, I think, properly have been brought on the law side of the court because in fact their objectives are to recover money damages on one basis or another. Cf. Schoenthal v. Irving Trust Company, 287 U.S. 92, 95, 53 S. Ct. 50, 77 L.Ed. 185. But, inasmuch as this question was not raised by the plaintiff or the defendant and these causes have been tried as parts of a consolidated cause in equity, I shall now deal with them on that basis.

A. *The Fourth Suit, Equity 79–365:*

In the fourth suit it is alleged by the plaintiff that eighteen checks, aggregating $466,933.79, were drawn on the bankrupt's account with the Bank to the order of Harriman during the period from February 26, 1929, to and including July 14, 1932, and were negligently honored by the Bank, which constituted conversion of the bankrupt's funds.

It is also alleged that charges were made against the bankrupt's account between September 24, 1929, and May 26, 1932, aggregating $179,000, by which funds were transferred to the credit of a personal account of Harriman's which he maintained in a stock brokerage house.

The aggregate of these sums involved in Suit No. 4 is $645,993.79, and is made up of the following items:

| | |
|---|---|
| February 26, 1929 | $ 10,095.00 (check) |
| September 6, 1929 | 10,000.00 (check) |
| September 24, 1929 | 29,000.00 (by way of charge slip) |
| July 31, 1930 | 100,000.00 (check) |
| July 31, 1930 | 50,000.00 (check) |
| December 10, 1930 | 150,000.00 (check) |
| December 15, 1931 | 3,000.00 (check) |
| December 29, 1931 | 44,348.79 (check) |
| April 8, 1932 | 1,250.00 (check) |
| April 18, 1932 | 100,000.00 (by way of charge slip) |
| April 26, 1932 | 3,000.00 (check) |
| April 27, 1932 | 2,200.00 (check) |
| May 11, 1932 | 2,000.00 (check) |
| May 25, 1932 | 2,500.00 (check) |
| May 26, 1932 | 50,000.00 (by way of charge slip) |
| June 4, 1932 | 4,000.00 (check) |
| June 7, 1932 | 2,300.00 (check) |
| June 24, 1932 | 2,000.00 (check) |
| June 30, 1932 | 2,000.00 (check) |
| July 1, 1932 | 75,000.00 (check) |
| July 14, 1932 | 3,000.00 (check) |

This, therefore, is in effect a suit by a depositor against a bank of deposit.

The domination of the Bank by Harriman, who also dominated the depositor, is immaterial, for Harriman did not act for the Bank's benefit in these transactions, and hence the usual rules governing the relations between a bank and its depositors apply, which, as stated in American National Bank v. Miller, 229 U.S. 517, at page 521, 33 S.Ct. 883, 884, 57 L.Ed. 1310, would be that if Harriman, as president of the Bank, "within the scope of his office, had knowledge of a fact which it was his duty to declare, and not to his interest to conceal, then his knowledge is to be treated as that of the Bank. For he is then presumed to have done what he ought to have done, and to have actually given the information to his principal."

The theory of the complaint is that since the eighteen checks were drawn to the order of Harriman, and since the debit ticket for $29,000, dated September 24, 1929, was credited to Harriman and the debit ticket, dated April 18, 1932, in the sum of $100,000, was marked, "Our cashier check to Harriman & Co.," and the debit ticket, dated May 26, 1932, in the sum of $50,000, was marked, "For check to order of Harriman & Co. for credit to J. W. Harriman's account," the Bank was charged with notice that Harriman, the president of the bankrupt, was converting the funds of the bankrupt.

The defendant receiver has denied such knowledge and has, inter alia, interposed the following defenses: (1) That the sums deposited with the Bank to the credit of the bankrupt were paid out by checks properly signed by officers of the bankrupt, pursuant to the authority of the bankrupt; and (2) that an account, accompanied by vouchers, was stated monthly between the parties during the entire period involved in this suit, and that, consequently, the plaintiff is estopped from complaining of these transactions.

It should be here noted that from the time JAMA began its operation in 1923, there was an account maintained on its books between it and Harriman, and every

time there was a deposit by Harriman or withdrawal by him or a loan to him, it was duly noted in that account.

It was not until after 1927, when Harriman donated to JAMA a bond and mortgage of the Forty-Fourth Street & Fifth Avenue Corporation—owner of the premises once occupied by the Bank of the United States—amounting to $1,285,000, that Harriman first became indebted to JAMA on its books.

At the end of every year, however, the balance of indebtedness, if any, was struck and anything Harriman owed to the corporation was evidenced by a promissory note signed by Harriman and payable to the Corporation.

The explanation of this procedure, so far as the relation between Harriman and JAMA is concerned, seems to me to be that Harriman's purpose was to owe a large amount to JAMA at all times so that he could reduce his income tax by charging interest on his loan from JAMA off against his income, and, in the event of his death, to have a large indebtedness to JAMA to be deducted from his estate.

The several items above mentioned will now be considered:

1. The check of February 26, 1929, for $10,095, constituted a loan to Harriman from JAMA, for which he gave a note on that date.

2. The check of September 6, 1929, for $10,000, constituted a loan to Harriman from JAMA, for which he gave a note on that date.

3. The charge slip of September 24, 1929, for $29,000, constituted a loan to Harriman from JAMA, for which he gave a note on that date.

4. The two checks of July 31, 1930, in amounts respectively of $100,000 and $50,000, constituted a loan to Harriman from JAMA, though they went through Harriman's personal account into the 14–A account with Harriman & Company, which was one of JAMA'S assets. This account was a cash deposit account on which JAMA received interest on credit balances.

5. The check of December 10, 1930, for $150,000, constituted a loan to Harriman from JAMA, and, although it went through Harriman's account, was deposited by him in the 14–A account with Harriman & Co. which was one of JAMA'S assets.

6. The check of December 15, 1931, for $3,000, constituted a loan to Harriman from JAMA. This was paid to Harriman as reimbursement for the payment of certain insurance and storage charges in JAMA'S behalf for the previous year which were customarily dealt with at the end of each year.

7. The check of December 29, 1931, for $44,348.79, was a loan by JAMA through Harriman to the M. H. O. Company, and was deposited in Account 86—the account which was carried by M. H. O. Company with Harriman & Company. This was in fact a transfer by way of loan of the funds of JAMA (Harriman's holding corporation) to M. H. O. Company (Harriman's trading company used in trading on margin in securities).

8. The check of April 8, 1932, for $1,250, constituted a repayment of $1,250 which Harriman had loaned to JAMA on April 5, 1932.

9. The charge slip of April 18, 1932, for $100,000, to Harriman from JAMA is thus explained: On that date an unsecured note of JAMA, indorsed by Harriman, was given to the County Trust Company in exchange for a loan of $100,000, which was shown by JAMA'S books to have been used as a payment of that amount for its loan to Augusta B. Harriman; JAMA'S assets were not decreased in any way by this transaction.

10. The check of April 26, 1932, for $3,000, was an advance to Harriman as shown by JAMA'S books and was debited to his account thereon, and was repaid by Harriman on August 4, 1932.

11. The check of April 27, 1932, for $2,200, to Harriman from JAMA was charged against Harriman's current account in that sum and was a repayment to Harriman of a similar sum received from him on March 30, 1932.

12. The check of May 11, 1932, for $2,000, to Harriman from JAMA was charged against Harriman on that date. Apparently this was used largely for personal expenses after transfer to his personal account No. 4.

13. The check of May 25, 1932, for $2,500, to Harriman from JAMA was debited to Harriman on JAMA'S books and was repaid by him on August 31, 1932.

14. The check of May 26, 1932, for $50,000, to Harriman from JAMA was made possible by a loan of $50,000 from

378

the Union Trust Company of Maryland which, less 5 per cent. discount, realized $48,715.27. The note by JAMA therefor was indorsed by Harriman, and secured by shares of Bank stock. It was deposited in JAMA'S account in the Harriman Bank and then there was a charge slip against that account that went to Harriman & Co. through the personal account of Harriman.

15. The check of June 4, 1932, for $4,000, to Harriman from JAMA was debited against Harriman's account with JAMA.

16. The check of June 7, 1932 for $2,-300, to Harriman from JAMA was also charged against Harriman on his account with JAMA.

17. The check of June 24, 1932, for $2,000, to Harriman from JAMA was debited against Harriman's account on JAMA'S books and constituted a loan from JAMA to him and was used by him to pay his current expenses.

18. The check of June 30, 1932, for $2,000, to Harriman from JAMA was debited against Harriman's account on JAMA'S books and constituted a loan from JAMA to him and was used by him to pay his current expenses.

19. The check of July 1, 1932, for $75,-000, to Harriman from JAMA came about thus: Harriman, who had power of attorney from a Mrs. Dixon, improperly drew a check in favor of JAMA on Mrs. Dixon's account for $75,000, and then having deposited that in JAMA'S account he drew a check to himself in that amount and credited his personal account with it. Then he drew a check on his personal account for $50,000 which went to Harriman & Company and a check for $24,000 which went to the Empire Trust Company to pay a personal loan to Harriman.

Thus all this amounted to was that after JAMA'S account had been credited with the proceeds of a theft, those proceeds were withdrawn. JAMA'S assets, however, were not in any way decreased.

20. The check of July 14, 1932, for $3,300, to Harriman from JAMA was a loan by JAMA to Harriman, and his account was charged with that sum.

These transactions were all within the authority given to Harriman by the directors of JAMA under the following resolution adopted January 26, 1923: "By motion duly made, seconded and carried,

it was Resolved that the Treasurer be, and she hereby is, authorized to open an account in the name of the J. A. M. A. Realty Const. Acct. or J. A. M. A. Realty Corp. in the Harriman National Bank of the City of New York, and to deposit therein all the funds of the Company coming into her custody, the said funds to be withdrawn by check signed by the President of the Company, or in his absence, or inability, to be signed by the Vice-President of the Company."

On January 26, 1923, JAMA, by its board of directors, is also represented to have adopted the following resolution—a certified copy of which was filed with the Bank on January 7, 1930—which, so far as is relevant in the suit under discussion, reads as follows (italics mine):

"Resolved, that an account be opened in the name of the corporation with the Harriman National Bank and Trust Company of the City of New York, and that the funds of the corporation may be deposited therein and that all checks, notes and other instruments for the payment of money made or drawn by, or upon, or payable to, the corporation, shall be signed, or accepted, or endorsed (other than for deposit), by the following officers of the corporation and in the manner stated: Joseph W. Harriman, Pres.

"And the said Bank is hereby authorized to pay such checks, notes, and other instruments for the payment of money, and also to receive the same for deposit to the credit, or in payment from, any holder (including checks drawn to cash or bearer or to the individual order of the officer signing the same), when so signed, or accepted, or endorsed, *without inquiry of any kind, whether payable to or tendered for deposit for the credit of, or in payment of the obligation of any officer or officers of the corporation, or otherwise.*"

"Resolved, that the authority conferred by the foregoing resolution is to be and remain in force until duly revoked by a proper resolution of the Board of Directors of the said corporation, and notice thereof in writing is given to said The Harriman National Bank and Trust Company of The City of New York."

The above resolution was never revoked and remained in full force and effect at all the times herein involved.

Hence the Bank cannot be held liable for the transactions above detailed, whether by way of checks or charge slips. **Cf.**

Empire Trust Co. v. Cahan, 274 U.S. 473, 479, 480, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921; Childs v. Empire Trust Co., 54 F.(2d) 981, 983, 984 (C.C.A.2).

██ From and prior to February 1, 1929, and monthly thereafter until on or about March 1, 1933, JAMA received from the Bank a statement in writing of all its accounts with the Bank.

Each of these statements contained entries of all moneys paid out on checks signed by JAMA, and of all charges to JAMA'S account since the date of the last previous monthly account, and of all moneys received by the Bank and credited to JAMA'S account, and thereby an account of all the transactions between JAMA and the Bank as respects all JAMA'S accounts was thereupon taken, made out, and stated monthly, and a balance struck, and the amounts for which the Bank was found indebted on said deposit accounts was agreed to by JAMA. With each of said monthly statements of account, JAMA received all its checks drawn on the Bank and all charge memoranda pursuant to which money was paid out by the Bank for its account since the date of the last statement of account.

All said statements of account, canceled checks, and charge memoranda were retained and accepted by JAMA without objection, and all statements of balances so arrived at and stated in said statements of account were accepted and agreed to by JAMA without objection.

With full knowledge of all the facts in any way connected with or relating to withdrawals from its deposit accounts with the Bank, therefore, JAMA ratified and confirmed monthly in all respects all charges to its deposit accounts with the Bank, and consented to the withdrawals of its funds which had occurred as therein set forth and as shown by the canceled checks and charge tickets.

In the course of JAMA'S dealings with the Bank from prior to February 26, 1929, to and including July 14, 1932, as concerns its deposit accounts with the Bank and the charges thereto by the Bank, the Bank justifiably relied on its said several monthly statements as made and accepted by JAMA. Cf. Empire Trust Company v. Cahan, 274 U.S. 473, 479, 480, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921; Potts & Company v. Lafayette National Bank, 269 N.Y. 181, 188, 189, 199 N.E. 50.

The receiver of the Bank has, therefore, made out the two defenses pleaded by him, to which I have referred above, and consequently this fourth suit must be dismissed.

B. *The Fifth Suit, Equity 80—100:*

██ In the fifth suit the complaint alleges that on January 8, 1930, Harriman, as president of JAMA, drew its check to the order of the Bank in the sum of $100,000, and this check was used to pay the balance of a demand loan owing to the Bank by the Midtown Trading Corporation, another of Harriman's wholly owned personal companies which has been described above.

The story of this transaction summarized is as follows:

On September 19, 1929, the Midtown Trading Corporation borrowed $241,087.50 from the Bank on a demand note.

On the same day two cashier's checks of the Bank were issued to Ardis Warwick & Co., stockbrokers, one for $118,637.50, and the other for $122,450. Apparently these checks were used to purchase 1,000 shares of the common stock of United States Steel Corporation. This stock was delivered on that same date to the Bank as security for the said loan, together with some other collateral.

By January 8, 1930, the loan from the Bank to the Midtown Trading Corporation had been paid down to $100,000.

On that date, acting through Harriman as its president, JAMA, which then admittedly had net assets of more than $5,000,000, drew its check for $100,000 to the order of the Bank and thus paid the balance of the money then owed to the Bank by the Midtown Trading Corporation.

It thus appears that the real transaction was in effect a loan from JAMA to the Midtown Trading Corporation in the sum of $100,000.

The books of account of JAMA showed this loan and showed that it was repaid in part on July 3, 1930, by two checks, one in the sum of $24,017.78, and the other in the sum of $3,500. The first of these checks represented the surplus proceeds from the sale ex-dividend of the shares of United States Steel which had been held as collateral by the Bank for the loan, and the second check of $3,500 represented a dividend received by the Bank on the said

Steel stock after it had been so sold ex-dividend.

The Bank is now called to account by the plaintiff because it cashed JAMA'S check for $100,000 and used the check to pay off this loan.

The loan itself was certainly not to be challenged, for JAMA was then solvent and could do what it pleased with its money. The fact that at the end of 1930 there was, after the payment above mentioned, a balance due on the loan of $72,-482.22, and that this balance was written off merely means nothing more than that JAMA either had made a bad loan or had decided to release the Midtown Trading Corporation from its obligation therefor.

It seems to me that this was a question of business judgment in the management of JAMA'S affairs, and I hold that the Bank is not liable to JAMA in this suit, in view of the resolutions lodged with the Bank by JAMA, just quoted in connection with the fourth suit, and also the accounts stated between the Bank and JAMA by the delivery of monthly accounts accompanied by vouchers, also therein set forth, for both these defenses were pleaded by the Bank in this suit as well as in the fourth suit.

C. *The Sixth Suit, Equity 80—140:*

▮ The complaint in the sixth suit alleges that on February 1, 1930, and on January 6, 1931, Harriman, as JAMA'S president, drew its check against its account with the Bank to the order of Evan W. Hughes, who was his confidential secretary, in the sum of $400,000 and $102,-600, respectively.

It is common ground that on February 1, 1930, JAMA had a net worth of approximately $5,441,770.79, and that on January 6, 1931, it had a net worth of approximately $4,696,963.59.

The advance of $400,000 to Evan W. Hughes was entered as a loan to him on JAMA'S books, and he turned it over on the same day to the M. H. O. Company, Inc., another of Harriman's privately owned companies which has been referred to above. Then the M. H. O. Company, Inc., at once drew its check in the sum of $400,000 in favor of Thomas L. Manson & Co., stockbrokers, and thereby paid for the purchase of stocks.

The advance to Hughes of $102,600 on January 6, 1931, was turned over on the same day by him to M. H. O. Company,

Inc., and deposited in its account with the Bank, and JAMA'S books show that this advance was also entered as a loan to Hughes.

Both these transactions were, therefore, actually loans to M. H. O. Company, Inc., via Hughes, as the books of account of JAMA and the M. H. O. Company, Inc., clearly show.

Why this involved procedure was followed is among the unsolved mysteries of this financial fairyland in which I have been working these past weeks.

On November 30, 1931, this loan was repaid to JAMA in the following manner:

Harriman on said date caused Harriman & Co., stockbrokers, with whom both the M. H. O. Company, Inc., and JAMA had accounts, to debit M. H. O. Company, Inc.'s account (known as Account No. 86) with $360,000, and at the same time to credit JAMA'S account (known as Account No. 14–A) with the same sum.

On the same day Harriman caused the M. H. O. Company, Inc., to deliver to JAMA 100 shares of Bank stock which then had a market value, in the pegged market above mentioned, of $1,426 per share. This represented the balance of $142,600 due on the loan from JAMA to M. H. O. Company, Inc., after the payment of the $360,000 in the manner above described.

All the proof in the sixth suit, therefore, merely comes to this: That in February, 1930, and in January, 1931, JAMA, when abundantly solvent, made loans to another of Harriman's privately owned companies, and that by November 30, 1931, these loans were repaid in the manner above indicated.

Consequently, the complaint in this sixth suit must be dismissed.

D. *The Seventh Suit, Equity 81—64:*

▮ 1. In the first cause of action in the seventh suit, the facts, briefly summarized, are as follows:

On June 7, 1932, Harriman & Co., stockbrokers, with whom JAMA and Harriman both had accounts, were holding 14,-000 shares of Southern Railway common stock in street form certificates for the account of JAMA. It should be remembered in this connection that by the letter of October 17, 1930, quoted above in connection with the valuation of JAMA'S 14–A Account with Harriman & Co., Har-

riman had thrown both JAMA'S account and his own account into hotchpotch.

Harriman was hopelessly insolvent on June 7, 1932, and, desiring to get these 14,000 shares of Southern Railway stock delivered to another of his brokers, caused Harriman & Co. to deliver the stock to him as president of JAMA. Apparently his purpose was to transfer these shares from Harriman & Co. to another of his brokers, G. M. P. Murphy & Co., and, accordingly, he caused G. M. P. Murphy & Co. to pay the Bank $200,000, the Bank to issue its cashier's check for $200,000, payable to Harriman & Co., and pass the stock on to G. M. P. Murphy & Co. As the certificates were all in street form, there was nothing in the transaction to put the Bank on notice as to its ownership.

In this connection it might not be inappropriate to refer to my decision in Satterwhite v. Harriman National Bank & Trust Company (D.C.) 13 F.Supp. 489, and make the observation that the reason why what Harriman did there was brought home to the Bank was because the shares of Standard Oil Company stock owned by Dr. Satterwhite, which was the principal subject-matter of that litigation, had been delivered to and receipted for by the Bank as security for a loan granted by the Bank through Harriman, and therefore the Bank as a corporation had become bailee of those shares and had to account for what had happened to them.

In the cause now under discussion, however, the Bank did not receipt for the Southern Railway shares as security for a loan or otherwise. JAMA receipted for them from Harriman & Co. and the Bank merely acted as a conduit through which, on payment of $200,000 to Harriman & Co. and reimbursement of the same amount by G. M. P. Murphy & Co., the shares were passed on to G. M. P. Murphy & Co.

Harriman's knowledge of the situation is not brought home to the Bank in any way because Harriman was not acting for the Bank in this situation.

The first cause of action under the seventh suit must, therefore, be dismissed.

2. The second cause of action in the seventh suit is for the recovery of the sum of $10,163.84 alleged to have been used by Albert M. Austin, the executive vice president of the Bank, in paying interest on a loan made by the Bank to one Sidney Bernheim.

The circumstances of this situation, which seems to be the first instance shown in this record of Harriman's improper activities, are that on October 10, 1931, Sidney Bernheim, a depositor in and a debtor to the bank, in pursuance of an arrangement with Harriman, signed a promissory note to the Bank in the sum of $300,000 and received a cashier's check for his note which he deposited to his own account in another bank. Bernheim then delivered his own check for $300,000, drawn on this other bank, to Harriman under a written agreement with Harriman which provided that Bernheim was to purchase certain shares of Bank stock, and that he would "be held free from the payment of any interest on the said loan."

The amount of interest due on this loan to the Bank from the date of the note, October 10, 1931, to July 1, 1932, was $12,900, and this amount was set up in JAMA'S books as a loan to A. M. Austin, the executive vice president of the Bank. All checks for this interest were drawn by Harriman on JAMA'S account at the Bank, cashed by the paying teller at the Bank, and the cash was then given to the note teller at the Bank to credit as interest on the Bernheim loan.

As against the $12,900 there was a credit on JAMA'S books of $2,736.16, which leaves a balance sued for, as above stated, of $10,163.84.

So far as the Bank was concerned, it seems to me that these checks, like those involved in Suit No. 4, were drawn in the ordinary course of business by the bankrupt and cashed by the Bank in the ordinary course of business under the authority of the resolutions quoted above. I do not see how notice of wrongdoing, if any, can be imputed to the Bank by the fact that the checks were drawn in Austin's favor, and Austin's knowledge of the matter certainly cannot be imputed to the Bank as he was not then acting for the Bank's interest or benefit. Cf. Potts v. Lafayette National Bank, 269 N.Y. 181, 188, 199 N.E. 50.

Nor did Harriman in any way purport to act for the Bank in this transaction, and consequently the rationale of my decision in the Satterwhite case cannot be applied here.

In addition to these considerations, the Bank has pleaded the same defenses to this cause of action as it pleaded in Suit No. 4, that an account, accompanied by vouchers, was stated monthly between JAMA and the Bank during the entire period here involved and that the plaintiff is, therefore, estopped from complaining of these transactions. I agree.

Accordingly, the second cause of action under the seventh suit must therefore be dismissed.

■ 3. The third cause of action under the seventh suit is in effect to establish an offset against the Bank's claim on a note for $30,000 given by the bankrupt to Harriman's wife, Mrs. Augusta B. Harriman. It alleges that by the activities of Mrs. Harriman, the bankrupt has been damaged upwards of $1,000,000 and is now in bankruptcy and that the damages thus sustained by JAMA by reason of Mrs. Harriman's acts should be offset against this note for $30,000.

My comments in this connection are twofold: First, that there has not been any proof of acts by Mrs. Harriman which caused any damage to the plaintiff; and, second, that if JAMA'S note to her is included in the claim filed by the receiver in JAMA'S bankruptcy proceeding, any defense to the effect that the receiver is not the holder in due course or is not entitled to maintain a recovery in respect of that note for any other reason, it can be raised in the bankruptcy proceeding.

Consequently, JAMA'S trustee in bankruptcy has an opportunity to defend against this note in bankruptcy, and therefore cannot be allowed to have recourse to equity for the indirect relief here sought when there is an adequate direct relief elsewhere available to him.

Accordingly, the third cause of action under the seventh suit must be dismissed.

■ 4. The fourth cause of action under the seventh suit seems to me to be based on one of the most fantastic of all transactions proved before me in this whole series of causes.

It seems that on January 6, 1932, Harriman caused JAMA to purchase from the Securities Corporation 700 shares of Anaconda Copper Company at a price of $112⅝ per share, although the market price on that day was $10 per share. It is claimed that the purpose of this transaction was to get moneys for the Securities Corporation to assist it in paying its semiannual dividend due January 7, 1932, for which it did not then have sufficient funds in its account with the Bank.

The mechanics of this transaction, as was usual in any situation with which Harriman was dealing, are inexplicably devious.

On January 1, 1932, JAMA had a balance in its account with the Bank of $6,910.20.

On January 6, 1932, a check from Harriman & Co. (JAMA'S stockbrokers who have been before mentioned) in the sum of $78,837.50 was deposited to JAMA'S credit in its bank account with the Bank. Harriman then, having apparently suddenly changed his mind as to the procedure he wished to follow, drew a check on JAMA'S account with the Bank to the order of Harriman & Co. in the sum of $78,837.50, and had this check certified by the Bank.

Then, on the same day, January 6, 1932, he caused JAMA to be debited and the Securities Corporation to be credited on their respective accounts at the Bank with the sum of $78,837.50, which was the agreed purchase price of the 700 shares of Anaconda Copper Company stock which JAMA had that day purchased from the Securities Corporation.

Apparently, either the certified check drawn by JAMA to Harriman & Co., or this debit ticket against JAMA, did not clear until the next day, January 7, 1932, and on that day JAMA received and had credited to its account the sum of $60,392.50, representing the dividends on its holdings of Bank stock. On the same day, there was also credited to JAMA'S account the sum of $18,445, which, added to the said dividends, makes up $78,837.50.

There was, therefore, always enough money in JAMA'S account to pay its checks and charge tickets in the ordinary course of business.

This is shown by the debits and credits in the account with the Bank for the period between January 2 and January 8, 1932, which are as follows:

| Debits | | Credits | |
|---|---|---|---|
| January 2 | $ 1,550.00 | January 2 | $ 173.00 |
| " 5 | 732.50 | " 2 | 1,000.00 |
| " 6 | 78,837.50 | " 6 | 78,837.50 |
| " 7 | 78,837.50 | " 7 | 60,392.50 |
| " 7 | 11.22 | " 7 | 18,445.00 |
| " 8 | 5.00 | | |

Whilst Harriman himself, as president of JAMA, might be liable to JAMA or its creditors for having thus caused JAMA to pay for the Anaconda stock more than ten times its value, and whilst the purpose of his doing so was to maintain largely for his own sake, a high market price for the Bank stock by not having the Securities Corporation pass its dividend, I cannot see how this transaction was of any benefit to the Bank as a bank, or how any liability on the part of the Bank can properly be spelled out of it.

That the Securities Corporation may have been considered to have benefited by selling some securities at an outrageous price is quite immaterial, for the Securities Corporation and the Bank were wholly separate entities which had different creditors and were created for different purposes under different laws.

The fourth cause of action under the seventh suit must therefore be dismissed.

5. The fifth cause of action under the seventh suit arises out of the following circumstances:

As has been above stated, JAMA was the owner of 1530 shares of stock in the 2 East Seventieth Street Corporation, which owned a cooperative apartment house at that address. JAMA, in right of such ownership, also held a so-called proprietary lease of an apartment in said house, and Harriman was the guarantor of this lease and a sublessee of JAMA'S under it.

An assignment of these shares and of the lease was first given, as above noted, on October 13, 1931, to the Securities Corporation as part of the collateral for a loan made by it to JAMA on that day.

Later, after JAMA'S loan from the Securities Corporation had been paid down, on or about January 11, 1932, Harriman caused the Securities Corporation to make an assignment of the said shares and of the lease to the Bank as collateral.

As I have held these shares and this lease to have been without value to JAMA, this assignment was, so far as I am concerned herein, merely a gesture and interests me not.

In March, 1933, Harriman, who had occupied, as sublessee of JAMA, the apartment on which JAMA had this proprietary lease, discontinued paying rent therefor and vacated the apartment shortly thereafter.

At that time there were in the apartment furniture and works of art covered by the chattel mortgage of September 8, 1932, which has been referred to above, and which was held by the Bank as collateral for the loan to JAMA via Levin.

Mr. Cooper, who was at that time conservator of the Bank, put a caretaker in charge of the apartment in order to preserve the situation and prevent damage to the mortgaged works of art contained in the apartment until he could have an opportunity of determining whether the shares and lease had any value as collateral.

JAMA remained in the position of lessee until August 31, 1933, when it was ousted by its landlord, 2 East Seventieth Street Corporation, which on or about September 14, 1933, commenced a proceeding in equity in this court, Docket No. Equity 76—292, to foreclose the lien given by its certificate of incorporation on the shares of stock owned by JAMA for any indebtedness owed by JAMA as proprietary lessees, and to secure a deficiency judgment for such indebtedness.

At the time when this suit was commenced, JAMA was not in bankruptcy, and it was first brought against JAMA, the Harriman National Bank & Trust Company, Henry E. Cooper as conservator thereof, and Joseph W. Harriman as guarantor on the lease.

Thereafter, on or about October 16, 1933, Frederick V. Goess was appointed receiver of the Bank by the Comptroller of the Currency, and on January 17, 1934, as was above noted, an involuntary petition in bankruptcy was filed against JAMA, under which it was adjudicated a bankrupt on February 2, 1934, and William R. Willcox was elected as its trustee in bankruptcy on or about March 13, 1934.

Accordingly, on June 8, 1934, a supplemental bill of complaint was filed by 2 East Seventieth Street Corporation by leave of court under which it was allowed to join Frederick V. Goess as receiver of the Bank, and William R. Willcox as trustee in bankruptcy of JAMA, as additional parties defendants in the said suit.

On or about June 15, 1935, the defendants,—the Bank, Cooper, its conservator, and Goess, its receiver—by stipulation, withdrew their answers to the bill of complaint and the supplemental bill of complaint and consented that the case should

be as if no answer had been interposed by them therein and that, so far as they were concerned, a decree should be granted to 2 East Seventieth Street Corporation for a foreclosure of its lien, and then they settled any question of deficiency judgment as against them by paying to 2 East Seventieth Street Corporation the sum of $2,500 which was to be deducted from the amount of any deficiency judgment which might be recovered against the other defendants.

The cause was tried before Judge Caffey and decided by him on October 3, 1935. He held that 2 East Seventieth Street Corporation was entitled to foreclose its lien on the JAMA stock and that it was entitled to a deficiency judgment against JAMA as lessee and Willcox as its trustee in bankruptcy, and Harriman as guarantor of the lease, for the amount of rent and charges under its lease from April 1 to August 31, 1933, in the sum of $7,740.67.

Subsequently, the deficiency judgment above mentioned against JAMA and Harriman was reduced by stipulation to $5,000, and it is to recover this sum that the cause of action now under discussion had been instituted against Goess as receiver of the Bank.

When Mr. Cooper was appointed conservator of the Bank, he had the duty and the right to take a reasonable time to determine the value of the lease as collateral and to maintain its validity meantime, and also to install a caretaker to see that the mortgaged furniture and works of art in the leased apartment were not disturbed. But in so doing he was not assuming JAMA'S obligation under its lease or incurring any liability over to JAMA in respect thereof.

On the contrary, under familiar principles, the receiver of the Bank, as successor in interest to the conservator thereof, would be entitled on foreclosure of the chattel mortgage and sale of the pledged lease to charge the proceeds thereof with all reasonable expenses incurred by the conservator in protecting the Bank's interest therein.

It is common ground that these expenses amounted in this case to $4,894.88, paid to the 2 East Seventieth Street Corporation in maintaining the lease, and to a caretaker for protecting the premises and the mortgaged chattels within them, and $2,500 in settlement of the suit above mentioned.

If, therefore, the plaintiff were entitled to any recovery in this consolidated cause in respect of the last four suits, the receiver, as he has pleaded an offset of this sum therein, would be entitled thereto as against any such recovery. But in view of my decision herein, the incidence of these expenses must, so far as this consolidated cause is concerned, remain with the receiver.

The fifth cause of action in the seventh suit must therefore be dismissed.

V. In view of my decision herein, it is not necessary to discuss the interesting questions of offset which have been raised by the defendant in its answer.

VI. This opinion will stand as the findings of fact and conclusions of law in this consolidated cause and its several constituent causes, and an order to this effect must be included in the final decree in each of the said causes.

VII. An order of consolidation in equity does not merge or fuse the causes thereby consolidated, but is merely an expedient which promotes convenience and economy in judicial administration because it enables a single trial of several causes involving the same issues or overlapping issues to be had. Cf. Johnson v. Manhattan Railway Company, 289 U.S. 479, 494, 496, 53 S.Ct. 721, 77 L.Ed. 1331, affirming the decision of the Circuit Court of Appeals for this Circuit, reported 61 F.(2d) 934, 940, which reversed the decision of the District Court for this District, reported 1 F.Supp. 809, 811–816.

VIII. Accordingly, seven final decrees, conforming respectively to the views hereinabove expressed in respect of each of the several constituent suits in this consolidated cause, may be submitted to me for signature on three days' notice.

These decrees may contain a provision staying their operation for a period of ten days to give the parties an opportunity to appeal therefrom if they are so advised.